**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

Richardson Foods, Inc., *et al.*,

                   Debtors.

**FOR PUBLICATION**

Chapter 7

Case No. 20-11203 (JPM)
(Jointly Administered)

**MEMORANDUM OPINION AND ORDER**
**DENYING MOTION FOR AN ORDER DISMISSING**
**THE CHAPTER 7 CASE OF RICHARDSON BRANDS COMPANY**

*A P P E A R A N C E S :*

**WHITE AND WILLIAMS LLP**
*Counsel for Doge Capital, LLC, and Randall Talcott*
7 Times Square, Suite 2900
New York, NY 10036
By:    Christopher Graham, Esq.

**DUNNINGTON BARTHOLOW & MILLER LLP**
*Counsel for Prairie Street Capital, Inc.*
230 Park Avenue, 21st Floor
New York, NY 10169
By:    Luke A. McGrath, Esq.

**TARTER KRINSKY & DROGIN LLP**
*Counsel for Deborah J. Piazza, Chapter 7 Trustee*
1350 Broadway, 11th Floor
New York, NY 10018
By:    Alex Spizz, Esq.

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

## I.    INTRODUCTION

Pending before the Court is Doge Capital, LLC ("**Doge**"), Randall Talcott ("**Talcott**")

and Prairie Street Capital, Inc.'s ("**Prairie**," collectively, with Doge and Talcott, the "**Movants**")

*Motion for an Order Dismissing the Chapter 7 Case of Richardson Brands Company* (the

"**Motion**"). (RFI Docket No. 113-1).[1] The Motion seeks dismissal of the case of Richardson

Brands Company ("**RBC**") as an unauthorized filing. (Motion ¶ 20).[2]

The Motion is supported by the *Certification of Christopher F. Graham, Esq. dated*

*November 2, 2023* (the "**Graham Certification**") (RFI Docket No. 113-2) and the *Memorandum*

*of Law in Support of Motion for an Order Dismissing the Chapter 7 Case of Richardson Brands*

*Company* (the "**Memo in Support**"). (RFI Docket No. 113-3).

In response to the Motion, Deborah J. Piazza in her capacity as Chapter 7 Trustee (the

"**Trustee**") filed the *Memorandum of Law in Opposition to Motion for an Order Dismissing the*

*Chapter 7 Case of Richardson Brands Company* (the "**Opposition**") (RFI Docket No. 122). The

Opposition is supported by the *Declaration of Deborah J. Piazza* (the "**Piazza Declaration**").

(RFI Docket No. 123).

On December 8, 2023, the Movants filed the *Reply Certification of Christopher F.*

*Graham in Support of Motion to Dismiss* (the "**Supplemental Graham Certification**") (RFI

---

[1] References to "**RFI Docket No.**" are to filings entered on the docket in *In re Richardson Foods, Inc. et al.*, No. 20-11203 (JPM) (Bankr. S.D.N.Y. May 15, 2020). References to "**RFI POC No.**" are to claims on the RFI Claims Register. References to "Bankruptcy Rule __" are to the Federal Rules of Bankruptcy Procedure. References to "Local Rule __" are to the Local Bankruptcy Rules for the Southern District of New York. References to "FRCP __" are to the Federal Rules of Civil Procedure.

[2] The RBC case is pending at *In re Richardson Brands Company*, No. 21-10439 (JPM) (Bankr. S.D.N.Y. Mar. 8, 2021). References to "**RBC POC No.**" are to claims on the RBC Claims Register. The RBC case is being jointly administered with the above-captioned case. (RBC Docket No. 49).

Docket No. 126), the *Reply Memorandum in Support of Motion to Dismiss the Chapter 7 Case of Richardson Brands Company* (the "**Reply**") (RFI Docket No. 127), and the *Affidavit of Michael G. Barry in Further Support of Dismissal* (the "**Barry Affidavit**"). (RFI Docket No. 128).

The Court held a hearing on December 12, 2023 (the "**Hearing**," and the transcript thereof, the "**Hearing Transcript**") where it heard arguments of Counsel. The Court has reviewed and considered the Motion, the Opposition, the Reply, the Hearing Transcript, all supporting documentation, and the record as a whole.

## II.    JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1) and the Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

## III.    BACKGROUND

### A.    THE DEBTORS' ORGANIZATIONAL STRUCTURE

RBC was a Florida corporation based in Canajoharie, New York. (Opposition at ¶ 9). RBC manufactured a full line of candy products and a seasoning product called Gravy Master. (*Id.*) Richardson Foods, Inc. ("**RFI**") was a Delaware corporation that owned the single share of RBC stock (the "**RBC Share**"), representing 100% of the equity in RBC. (*Id.* ¶¶ 2, 10, 13). RFI was a holding company with no operations or employees. (*Id.*)

RBC's board of directors (the "**RBC Board**") consisted of three members: (i) John Teeger ("**Teeger**") as chairman of the board; (ii) Warren Haber ("**Haber**"); and (iii) Kobi Afek ("**Afek**"). (RFI Docket No. 123-1 at ¶ 1). As is relevant here, the RBC bylaws (the "**RBC Bylaws**") provide:

> Subject to the limitations of the articles of incorporation, these bylaws, and the Florida Business Corporation Act concerning corporate action that must be authorized or approved by the shareholders of the corporation, all corporate powers

3

shall be exercised by or under the authority of the board of directors, and the business and affairs of the corporation shall be managed under the direction of the board of directors.

(RFI Docket No. 113-7, Art. 3, § 1).

Additionally, the RBC Bylaws provide that a "director may resign at any time by delivering written notice to the board of directors or its chairman or to the corporation." (*Id.* at Art. 3, § 11). "A resignation is effective when the notice is delivered unless the notice specifies a later effective date." (*Id.*) In the event of a vacancy on the RBC Board, the RBC Bylaws provide:

> Any vacancy occurring in the board of directors . . . may be filled by the affirmative vote of a majority of the remaining directors even though it is less than a quorum of the board of directors, unless otherwise provided by law or the articles of incorporation. A director elected to fill a vacancy shall hold office only until the next election of directors by the shareholders, which may be at an annual or special meeting of shareholders called for that purpose.

(*Id.* at Art. 3, § 10). The RBC Bylaws further provide:

> These bylaws may be altered, amended, or replaced and new bylaws may be adopted by the board of directors; provided that any bylaws or amendments to it as adopted by the board of directors may be altered, amended, or repealed by vote of the shareholders, or a new bylaw in lieu of it may be adopted by the shareholders. No bylaw which has been altered, amended, repealed, or adopted by such a vote of the shareholders may be altered, amended or repealed by a vote of the board of directors if the shareholders, in amending or repealing the bylaws generally or a particular bylaw provision, provide expressly that the board of directors may not amend or repeal the bylaws or that bylaw provision.

(*Id.* at Art. 11).

## B. **THE WEBSTER LOAN**

On December 24, 2014, RFI and RBC entered into the *Credit and Security Agreement* (the "**Webster Loan**") with Webster Business Credit Corporation ("**Webster**") establishing a revolving line of credit. (RFI Docket No. 119-2). As is relevant here, the Webster Loan identified as collateral essentially all of RFI and RBC's assets including receivables, equipment,

general intangibles, inventory, contract rights, equity interests, securities, real property, leasehold

interests, and commercial tort claims, among other things. (*Id.* at 82–83).

　　　As part of the Webster Loan, RFI and Webster also entered into the *Subsidiary Pledge*

*Agreement* (the "**Pledge Agreement**") on the same date. (RFI Docket No. 113-8). Under the

Pledge Agreement, RFI "specifically pledged and assigned the sole RBC Stock Certificate,

representing 100% of the shares and equity ownership in RBC, to Webster . . . and attached the

original Stock Certificate and an assignment in blank for Webster's benefit to the Pledge

Agreement." (Memo in Support at ¶ 17). As part of the Pledge Agreement, RFI was prohibited

from voting the RBC Share to liquidate the company. (*Id.* at ¶ 37 (citing Pledge Agreement §

7(a)(i)(A))).

　　　The Pledge Agreement also provided:

> Promptly following the payment in full of the [obligations under the Webster Loan]
> and the irrevocable termination of the [Webster Loan], [Webster] shall deliver to
> [RFI] the [RBC Share] pledged by [RFI] at the time subject to this [Pledge]
> Agreement and all instruments of assignment executed in connection therewith,
> free and clear of the liens hereof and, except as otherwise provided herein, all of
> [RFI]'s obligations hereunder shall at such time terminate.

(Pledge Agreement § 14).

　　　Webster filed a UCC Financing Statement against RFI in Delaware on December 24,

2014, and against RBC in Florida on December 29, 2014, in both instances identifying "[a]ll

assets of the Debtor, whether now owned or hereafter acquired" as Webster's collateral.[3] (RFI

Docket No. 113-9 at 4, 7).

## C. THE DOGE AND TALCOTT LOANS

　　　On February 5, 2018, RFI entered into a *Secured Promissory Note* agreement with Doge

(the "**Doge Loan**") in the amount of $900,000. (RFI Docket No. 113-10 at 2–11). On that same

---

[3] Webster filed continuations of both of its UCC Financing Statements on October 19, 2019. (*Id.* at 5, 8).

date, RFI entered into a *Secured Promissory Note* agreement with Talcott (the "**Talcott Loan**,"

and together with the Doge Loan, the "**Doge and Talcott Loans**") in the amount of $100,000.

(*Id.* at 12–20). As part of the Doge and Talcott Loans, Doge and Talcott were granted liens

against all of RFI's assets, subordinate to Webster's lien. (*Id.* at 5, 15 (§ 3.1 of both

agreements)). On March 22, 2018, Doge and Talcott filed UCC Financing Statements against

RFI in Delaware. (RFI Docket No. 113-1 at 9–12). Both financing statements described the

following as collateral:

> All assets of the Debtor including, without limitation, machinery, equipment,
> furniture, furnishings, tools, tooling, fixtures, and accessories, and all inventory,
> accounts receivable, instruments, contract rights and other rights to receive the
> payment of money, patents, chattel paper, licenses, leases and general intangibles,
> including all trade names and trade styles and all additions, accessions,
> modifications, improvements, replacements and substitutions thereto and therefor,
> whether now owned or hereafter acquired or arising, and the proceeds, products
> and income of any of the foregoing, including insurance proceeds.

(*Id.* at 10, 12).

### D.  <u>THE PRAIRIE LOAN</u>

The following year, on August 23, 2019, Webster, Founders Equity I LP ("**Founders**"),

RFI, RBC, and Prairie entered into the *Amended and Restated Cash Collateral Deposit*

*Agreement* (the "**First Amended Subrogation Agreement**"). (RFI Docket No. 126-10).[4] The

purpose of the First Amended Subrogation Agreement was to reflect the fact that Prairie had

"deposit[ed] and pledge[d] . . . $280,000 into Account No. 717800902_ maintained at Webster []

. . . to be held by [Webster] as collateral security for the [Webster Loan] . . . ." (the "**Prairie**

**Loan**"). (RFI Docket No. 126-10 at 2–3).

---

[4] Though not in the record, it appears that the original Cash Collateral Deposit agreement (the "**Original Cash Collateral Agreement**") was between Webster, Founders, RFI, and RBC to reflect the fact that Founders had deposited $380,000 into the Debtors' bank account maintained at Webster, to be held as collateral security for the Webster Loan. (*Id.* at 2).

On October 24, 2019, Webster, Founders, RFI, RBC, Prairie, Haber, and Teeger entered into the *Second Amended and Restated Cash Collateral Deposit Agreement* (the "**Second Amended Subrogation Agreement**," and collectively with the First Amended Subrogation Agreement, the "**Subrogation Agreements**"). (*Id.* at 11–18). The purpose of the Second Amended Subrogation Agreement was to reflect the fact that Founders, Haber and Teeger (together, with Founders and Prairie, the "**Pledgors**") had deposited and pledged additional funds (the "**Pledged Collateral**") into bank accounts maintained at Webster, to be held by Webster as additional collateral security for the Webster Loan. (*Id.* at 12). The Second Amended Subrogation Agreement contained a term stating that the Second Amended Subrogation Agreement "amend[ed] and restate[d]" the Original Cash Collateral Agreement and the First Amended Subrogation Agreement in their entirety and was "made in substitution for and not in satisfaction thereof." (*Id.* at 15 (§ 17 of the Second Amended Subrogation Agreement)).

The Second Amended Subrogation Agreement also provided that the Pledgors assigned, transferred, and pledged to Webster for its benefit a security interest in the Pledged Collateral. (*Id.* at 12–13 (§ 4 of the Second Amended Subrogation Agreement)). The Second Amended Subrogation Agreement further specified that the Pledged Collateral is security for the Webster Loan. (*Id.* at 13 (§ 5 of the Second Amended Subrogation Agreement)).

The Second Amended Subrogation Agreement also contained a subrogation provision (the "**Subrogation Provision**"), which stated:

> In the event of application of any Pledged Collateral to the payment of the [Webster Loan] (such amount, the "**Applied Amount**"), [such Pledgor] shall be subrogated to the extent of such application to all of the rights of recovery of [Webster], and [Webster] agrees to execute such documents reasonably requested by [such Pledgor] to effect such subrogation, all at Pledgor's expense and in form and substance satisfactory to [Webster]. Notwithstanding the foregoing, [Pledgors] agree that (i) any such Applied Amount and associated rights of recovery are expressly subordinate and junior for all purposes and in all respects to [Webster's]

7

right to receive payment in full in cash of the [Webster loan]; (ii) until the Webster Loan ha[s] been paid in full in cash and the [Webster Loan] is irrevocably terminated, [Pledgors will not] demand, receive, or accept any payment in any form or amount in respect of the Applied Amount; and (iii) this [Second Amended Subrogation Agreement] shall neither be contingent upon the existence of the subrogation rights nor subject to any claims or defenses whatsoever which may be asserted in connection with the enforcement or attempted enforcement of the subrogation rights including, without limitation, any claims that the subrogation rights were abrogated by any acts of [Webster]. If, notwithstanding the foregoing, any amount shall be paid to a Pledgor on account of such subrogation rights at any time when [the Webster Loan] ha[s] not been paid in full in cash and the [Webster Loan] shall not have been terminated, such amount shall be held by Pledgor in trust for [Webster], segregated from other funds of Pledgor, and shall forthwith upon, and in any event within two (2) business days of, receipt by Pledgor be turned over to [Webster] in the exact form received by Pledgor, to be applied against the [Webster Loan], whether matured or unmatured, in such order as [Webster] may determine, subject to the provisions of the [Webster Loan].

(*Id.* at 3 (§ 8 of the Second Amended Subrogation Agreement)). Importantly, the Subrogation Agreements do not explain the origin of the Prairie Loan—or for that matter, the loans of any of the other Pledgors—or its essential terms.

### E.  <u>THE SALE TO ROSES CONFECTIONS LIMITED</u>

On September 28, 2018, Webster, RFI, and RBC entered into the *Forbearance and Amendment No. 5* (the "**Fifth Forbearance**"). (*See* RFI Docket No. 113-11). The Fifth Forbearance acknowledged that, as of September 27, 2018, the Debtors had outstanding balances due under the Webster Loan in the amount of $2,344,083.73 and provided specific terms by which the Debtors were to cure the defaults on the Webster Loan. (*Id.* at 2). The Fifth Forbearance also identified certain forms of default under the Fifth Forbearance. (*Id.* at 3).

On February 25, 2020, Roses Holdings Limited ("**Roses Holdings**") and Webster agreed in principle on the terms of a UCC sale (the "**Roses Proposal**") of all of the "[c]ollateral as such term is defined in that certain [Webster Loan] . . . that is comprised of personal property assets (the "**Personal Property Assets**")." (RFI Docket No. 123-5 at 2). The Roses Proposal

contemplated: (i) the purchase of the Personal Property Assets for at least $2,200,000, or an amount sufficient to pay off the Webster Loan in full (*id.* at § 1(c)); and (ii) the sale of certain real property located at 101 Erie Boulevard, Canajoharie, NY 11317 (the "**Real Property Collateral**") to a Roses affiliate. (*Id.* § 3(c)).

Shortly thereafter, on March 9, 2020, Webster, RFI, and RBC signed the *Acknowledgement of Events of Default* (the "**Default Letter**"). (RFI Docket No. 113-12). As part of the Default Letter, RFI and RBC acknowledged unpaid obligations totaling $3,402,871.86. (*Id.* at 1). Due to the default, RFI and RBC surrendered all of their collateral under the Webster Loan to Webster, consented to a private sale to Roses Holdings, and acknowledged that they had no remaining right to redeem the collateral. (*Id.* at 3). The Default Letter contemplated that, in exchange for the Webster Loan collateral, Roses Holdings would pay $2,510,871.66 to Webster to satisfy the Webster Loan in full and make the following payments pursuant to the Subrogation Agreements: (i) $442,732.60 to Founders; (ii) $228,717.95 to Prairie; (iii) $110,274.72 to Teeger; and (iv) $110,274.73 to Haber. (*Id.* at 9). The Default Letter also contemplated that Roses Holdings would attempt to collect RBC and RFI's outstanding accounts receivable following the sale and would distribute 70% of any accounts receivable collected first to Prairie up to $51,282.05, and thereafter on a pro rata, *pari passu* basis to Prairie up to $1,100,175.97, and Talcott up to $122,241.78. (*Id.* at 10).

On that same date, Webster, as seller, and Roses Confections L.P. ("**Roses Confections**"), an affiliate of Roses Holdings, as buyer, entered into the Secured Party General Conveyance and Bill of Sale (the "**Roses UCC Sale**"). (RFI Docket No. 113-13). The Roses UCC Sale provided for a sale that was substantially the same as that contemplated by the Default Letter. (*Id.* at 2).

9

### F.  THE BANKRUPTCY PROCEEDINGS

On May 15, 2020, Doge, Three Oaks Advisors, LLC, and Talcott filed an involuntary chapter 7 bankruptcy petition against RFI. (Opposition ¶ 11). The Court entered an order for relief on July 1, 2020, and Deborah J. Piazza was duly appointed as Chapter 7 Trustee of RFI later that month. (*Id.*)

On December 28, 2020, the Trustee filed the *Motion to Approve Trustee in Bankruptcy Financing Pursuant to 11 U.S.C. § 364(c)(2)* (the "**Trustee Financing Motion**"). (RFI Docket No. 36). In the Trustee Financing Motion, the Trustee sought financing from Prairie (the "**Trustee Financing**") to "conduct an investigation into the [Roses UCC] Sale to determine if the [Roses UCC] Sale was for fair consideration as well as [investigate] the disposition of the proceeds of the Sale." (*Id.* at 5). The Court granted the Trustee Financing Motion on January 14, 2021. (RFI Docket No. 44). The Trustee Financing contained the following terms: (i) the Trustee was authorized to borrow $25,000 from Prairie; (ii) Prairie was granted a first priority security interest in any eventual recovery from any litigation stemming from the Trustee's investigation; and (iii) if the Trustee did not bring any litigation, there was no obligation for the Trustee to pay back the Trustee Financing. (*Id.*)

Thereafter, the Trustee conducted discovery in the RFI case and determined that RBC may have claims for actual and constructive fraudulent conveyances stemming from what the Trustee characterizes as "a flawed sale process of RBC's assets designed only to benefit Webster, the Debtors' insiders, and the Movants." (Opposition at ¶ 16). Accordingly, the Trustee filed a voluntary Chapter 7 petition on behalf of RBC on March 8, 2021, to preserve these potential claims. (*Id.*) Attached to the RBC petition was a resolution (the "**Resolution**"), dated March 8, 2021, which stated:

> I Deborah Piazza, the Chapter 7 trustee ("Trustee") of Richardson Foods, Inc., the 100% shareholder of Richardson Brands Company ("RBC") have in the exercise of my business judgement and in accordance with my fiduciary duties determined it is in the best interest of RBC, its creditors and other parties in interest that it seek relief under the provisions of Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") and accordingly I have authorized my attorneys Tarter Krinsky & Drogin LLP to file a Chapter 7 bankruptcy petition and any other documents required by the Bankruptcy Code, Federal Rules of Bankruptcy Procedure and the local rules of the United States Bankruptcy Court for the Southern District of New York on behalf of RBC.

(RBC Docket No. 1-1).

On March 15, 2021, the Trustee filed the *Notice of Possible Payment of Dividends and of Last Date to File Claims* (the "**Bar Date Notice**") setting a claims bar date in the RBC case of June 17, 2021.[5] (RBC Docket No. 14).

The Trustee filed RBC's amended schedules (the "**RBC Schedules**") on June 3, 2021. (RBC Docket No. 19).[6] The schedules identified Doge as the holder of a $2,500 unsecured claim that was not contingent, unliquidated, or disputed. (*Id.* at 15). Prairie and Talcott were not listed in the RBC Schedules.

On June 7, 2022, the Trustee commenced an adversary proceeding[7] (the "**Adversary Proceeding**") against the Movants, Webster, Roses Holdings, Roses Limited, Roses RE Holdings, LLC ("**Roses RE**" and together, with Roses Holdings and Roses Confections, "**Roses**"), Founders, Teeger, Haber, and Afek seeking recoveries for fraudulent conveyances. (Opposition at ¶ 17). On January 10, 2023, this Court approved a partial settlement with all the defendants except the Movants whereby the settling defendants agreed to pay $400,000.00 in full settlement of the Trustee's claims. (*Id.*) The Trustee seeks the following amounts from the

---

[5] None of the Movants have filed proofs of claim in the RBC case, though Doge and Talcott both filed proofs of claim in the RFI case. (See RBC Claims Register; RFI POC 10-1; RFI POC 11-1).

[6] The Trustee filed RBC's initial schedules on March 10, 2021. (RBC Docket No. 5).

[7] The Adversary Proceeding is pending at *Piazza v. Afek et al.*, No. 22-01103 (JPM) (Bankr. S.D.N.Y. Jun. 7, 2022). References to "AP Docket No." are references to filings on the Adversary Proceeding docket.

Movants in the Adversary Proceeding: $696,517 from Doge, $228,717 from Prairie, and $77,390 from Talcott. (*Id.*)

Through the Motion, the Movants seek dismissal of the RBC bankruptcy case under Section 707(a) of the Bankruptcy Code because they assert that: (i) the Trustee lacked authority to file RBC's bankruptcy petition under Florida corporate law (Memo in Support at ¶¶ 29–35); and (ii) the Trustee was incapable of voting the RBC Share to authorize the bankruptcy petition because RFI pledged and surrendered the RBC Share years before the bankruptcy petition was filed. (*Id.* at ¶¶ 36–46).

In response, the Trustee asserts that the Movants lack standing because: (i) they are not creditors or parties in interest to RBC (Opposition at ¶¶ 20–23); and (ii) even if they were parties in interest, the Movants lack standing to move to dismiss the RBC case on the grounds that the board of directors did not approve it. (*Id.* at ¶¶ 24–26). Additionally, the Trustee asserts that, even if the Movants do have standing to make the Motion, the Motion should be denied because: (i) the powers of a Trustee in bankruptcy allow trustees to file bankruptcy petitions of subsidiaries (*id.* at ¶¶ 34–37); (ii) the Trustee has the power to amend the RBC bylaws to allow the shareholders to authorize the bankruptcy petition *nunc pro tunc* (*id.* at ¶¶ 38–44); (iii) the Trustee can vote the RBC Share because the Pledge Agreement terminated upon payment in full at the Roses UCC Sale (*id.* at ¶¶ 45–47); (iv) the Trustee did not abandon or surrender the interest in the RBC stock (*id.* at ¶¶ 48–55); (v) only the Trustee has the power to vote the RBC Share (*id.* at ¶¶ 56–57); and (vi) the Motion is barred by the equitable theory of laches. (*Id.* at ¶¶ 27–33).

In the Reply, the Movants generally argue that: (i) they do, in fact, have standing to bring the Motion (Reply at 1–4); (ii) laches is inapplicable (*id.* at 5–9); and (iii) the Trustee does not

have the power to vote the RBC Share under any of the theories raised in the Opposition. (*Id.* at 9–15).

The Court will address these issues in turn.

## IV.    LEGAL STANDARDS AND DISCUSSION

Bankruptcy Code Section 707(a) provides that the Court may dismiss a Chapter 7 case for cause, including:

(1) unreasonable delay by the debtor that is prejudicial to creditors;
(2) nonpayment of any fees or charges required under chapter 123 of title 28; and
(3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521(a), but only on a motion by the United States Trustee.

11 U.S.C. § 707(a). Although "the Bankruptcy Code does not define 'cause,' [] the three examples given in section 707(a) are illustrative, not exclusive." *In re Smith*, 507 F.3d 64, 72 (2d Cir. 2007) (citations omitted). Accordingly, the determination of whether cause exists to dismiss a Chapter 7 case under Section 707(a) of the Bankruptcy Code is "guided by equitable considerations and is committed to the court's sound discretion." *In re Genger*, No. 19-13895 (JLG), 2023 WL 4311219, at *20 (Bankr. S.D.N.Y. June 30, 2023) (citing *Wilk Auslander LLP v. Murray (In re Murray)*, 900 F.3d 53, 58–59 (2d Cir. 2018) (additional citations omitted)). Further, in determining whether cause exists to dismiss a Chapter 7 case, the Court must examine "whether dismissal would be in the best interest of all parties in interest." *In re Smith*, 507 F.3d at 72 (quoting *In re Dinova*, 212 B.R. 437, 442 (B.A.P. 2d Cir. 1997)).

### A.    MOVANTS' BANKRUPTCY STANDING

In the Trustee's Opposition to the Motion, the Trustee first asserts that the Movants lack standing to move to dismiss the RBC case because the Movants are not creditors or parties in interest of RBC. (Opposition at ¶¶ 20–23). Specifically, the Trustee assets that: (i) the Movants

13

possess no documents evidencing an obligation from RBC (*id.* at ¶ 21); (ii) the Movants have not filed a proof of claim against RBC despite the passing of the claims bar date, and further, that Talcott and Doge only filed proofs of claim in the RFI case (*id.*); and (iii) the Movants' only relation to RBC is as defendants in the Adversary Proceeding. (*Id.*)

In response, the Movants assert that they have both Article III standing under the United States Constitution and also under the Bankruptcy Code. (Reply at 7–9). Specifically, they argue that: (i) they have been harmed by the Trustee's filing of the RBC case and that the term "party in interest" under the Bankruptcy Code is broad (*id.* at 7–8); (ii) they have vested interests "by subrogation; pledges; and liens" in the stock of RBC (*id.* at 8); and (iii) Doge has individual standing because it was included in the RBC schedules. (*Id.*)

Courts in this circuit have held that bankruptcy standing "is limited to parties in interest." *In re Manshul Constr. Corp.*, 223 B.R. 428, 429 (Bankr. S.D.N.Y. 1998) (quoting *In re Hutter,* 215 B.R. 308, 312 (Bankr. D. Conn. 1997) (*citing Licensing by Paolo, Inc. v. Sinatra (In re Gucci),* 126 F.3d 380, 388 (2d Cir. 1997)). "Party in interest" is not defined in the Bankruptcy Code, but "the phrase has generally been interpreted in a Chapter 7 case to refer to creditors of the debtor who have claims against the estate and whose pecuniary interests are directly affected by the bankruptcy proceedings." *Id.* (quoting *In re Slack,* 164 B.R. 19, 22 (Bankr. N.D.N.Y. 1994)). In other words, party in interest standing requires a party to have an interest in the "distribution to creditors of assets of the estate." *Id.* (quoting *In re Kressner,* 159 B.R. 428, 432 (Bankr. S.D.N.Y. 1993) (additional citations omitted)).

Accordingly, the Court will first determine whether the Movants have standing to bring the Motion.

### 1. **Movant's Standing as a Result of the Adversary Proceeding**

As stated above, the Trustee argues that the Movants' only interest in the RBC case is as defendants in the Adversary Proceeding. (Opposition at ¶ 21). In response, the Movants assert that "party in interest" is a broad term, and that they have been "wronged by the Trustee's actions in purporting to file [the] RBC [p]etition." (Reply at 8).

Where a party's only nexus to a bankruptcy case is their status as defendants in an adversary proceeding, such parties are not parties in interest. *In re Manshul Constr. Corp.*, 223 B.R. at 431. In *Manshul Construction Corporation*, the court analyzed whether being a defendant in an adversary proceeding alone entitles a party to object to proofs of claim in the main bankruptcy case. *Id.* In finding that a movant's status as an adversary proceeding defendant alone is insufficient to confer "party in interest" standing in a bankruptcy case, the court stated:

> In essence, the [movants'] only ground for standing is as defendants in the Adversary Proceeding. Indeed, in their own motion papers, the [movants] assert that the purpose of their objection to certain claims is to establish that the creditors named in the Adversary Proceeding do not hold allowable general unsecured claims that would invest the Trustee with causes of action in the Adversary Proceeding. That question will be resolved in the Adversary Proceeding, not as a motion in the main bankruptcy case. *See In re FBN Food Servs., Inc.*, 1995 WL 230958 *4 (N.D.Ill. April 17, 1995) (defendant in adversary proceeding not a party in interest with standing to participate in the allowance or disallowance of claims process), *appeal dismissed,* 82 F.3d 1387 (1996); *In re Delta Underground Storage Co., Inc.*, 165 B.R. 596 (Bankr.S.D.Miss.1994) (defendant in adversary proceeding lacked standing to object to settlement in main case). The [movants] have no interest in this estate beyond their interest as defendants in an adversary proceeding. To permit them to sustain this motion would lead to the illogical result of catapulting them to standing above the Debtors and their estates' creditors.

*Id.*

Here, it appears to the Court that a primary purpose of this Motion may be to divest the Trustee of standing to prosecute the Adversary Proceeding where the Movants are defendants. Accordingly, for the same reasons outlined by the court in *Manshul Construction Corporation*, to the extent that Movants' standing is dependent upon their status as defendants in the

Adversary Proceeding, the Court finds that the Movants do not have standing to bring this Motion. However, as the Movants have asserted that they are also creditors or parties in interest of RBC individually, the Court will examine each of the Movant's individual standing.

### 2. **Movants' Individual Standing**

#### a. **Doge**

The Trustee argues that Doge is not a creditor or party in interest of RBC because Doge has not presented any evidence showing an obligation owed by RBC. (Opposition at ¶ 21).

In the Reply, the Movants argue that Doge is a creditor of RBC because Doge was included by the Trustee in RBC's schedules. (Reply at 8). The Movants assert that this is sufficient to confer Doge with party in interest standing in the RBC bankruptcy case. (*Id.*) They further allege that Doge can file a late proof of claim in any event, which would make them a creditor of RBC. (*Id.*) Finally, they assert that Doge is a party in interest as to RBC due to vested interests "by subrogation; pledges; and liens" in the stock of RBC created by virtue of the Subrogation Agreements, the Pledge Agreement and the terms of the Doge Loan. (*Id.*)

In this case, the Trustee listed Doge as the holder of a $2,500 unsecured claim in RBC's Schedule E/F. (RFI Docket No. 19 at 15). The Trustee filed a *Notice of Possible Dividends* on March 15, 2021, which set a claims bar date of June 17, 2021. (RFI Docket No. 14). Despite receiving the *Notice of Possible Dividends*, Doge did not file a proof of claim in the RBC case. (*See* RFI Docket No. 14-1 at 1 (where Doge is included as a notice recipient)).[8]

Pursuant to Bankruptcy Rule 3002(a), unsecured creditors must file a proof of claim or interest for the claim to be allowed. Fed. R. Bankr. P. 3002(a). Even where a creditor is included in a debtor's schedules, "[m]ere inclusion in the Debtors' schedules does not constitute an

---

[8] Though Doge did not file a proof of claim in the RBC case, they did file a proof of claim in the RFI Case. (See RFI POC 10-1).

informal proof of claim." *See In re Dumain*, 492 B.R. 140, 149 (Bankr. S.D.N.Y. 2013) (additional citations omitted); *see also In re Yonkers Pro. Hosp.*, 113 B.R. 153, 157 (Bankr. S.D.N.Y. 1990) (holding that creditors listed in the debtor's schedules may not rely on their treatment in the debtor's schedules if they receive notice of the bar date but do not file a claim).

Although the Movants are correct that Doge can file a tardy proof of claim that would entitle it to distribution in the RBC case, the Court agrees with the Trustee that the Movants have provided no evidence indicating that Doge has such a claim.[9] Indeed, as set forth herein, the Doge Loan merely establishes that Doge is a creditor or party in interest as to RFI, not RBC. (RFI Docket No. 113-10 at 2–11). Additionally, Doge is not a party to the Subrogation Agreements or the Pledge Agreement, and even if it were, those agreements do not establish Doge's standing in the RBC case. For these reasons, the Court agrees with the Trustee that Doge is not a creditor or party in interest as to RBC and has no standing to bring the Motion.

### b. **Talcott**

The Trustee argues that Talcott is not a creditor or party in interest of RBC for the same reasons as Doge, namely because Talcott has not presented any evidence showing an obligation owed by RBC. (Opposition at ¶ 21). In response, the Movants argue that Talcott is a creditor or party in interest of RBC due to vested interests "by subrogation; pledges; and liens" in the stock of RBC created by virtue of the Pledge Agreement, Subrogation Agreements, and the terms of the Talcott Loan. (Reply at 8).

However, like Doge and as set forth *supra*, section (IV)(A)(2)(b), the only evidence submitted by Talcott establishes that Talcott is a creditor as to RFI, not RBC. (RFI Docket No.

---

[9] Section 727(a)(3) entitles unsecured creditors who file tardy proofs of claim without excuse to distribution after other general unsecured creditors. *See* 11 U.S.C. § 727(a)(3). However, Doge has not filed a tardy proof of claim, and, as set forth above, has not provided any evidence showing any entitlement to do so.

113-10 at 12–20). Additionally, like Doge, Talcott is not a party to the Subrogation Agreements or the Pledge Agreement, and even if Talcott was, those agreements do not establish Talcott's standing in the RBC case. Accordingly, the Court agrees with the Trustee that Talcott is also not a creditor or party in interest as to RBC and has no standing to bring the Motion.

### c. **Prairie**

Finally, the Trustee also argues that Prairie is not a creditor or party in interest of RBC because Prairie has also not presented any evidence showing an obligation owed to it by RBC. (Opposition at ¶ 21). Like Doge and Talcott, the Movants allege in response that Prairie is a creditor or party in interest of RBC due to vested interests "by subrogation; pledges; and liens" in the stock of RBC created by virtue of the Pledge Agreement, Subrogation Agreements, and the Prairie Loan. (Reply at 8).

Preliminarily, the Court notes that the relationship between Prairie, RFI, and RBC is not entirely clear from the record. As set forth above, the First Amended Subrogation Agreement describes the Prairie Loan as a $280,000 deposit into a bank account maintained at Webster to be held by Webster as collateral security for the Webster Loan. (RFI Docket No. 126-10 at 2–3). Critically, no provision of the First Amended Subrogation Agreement (or for that matter, the Second Amended Subrogation Agreement) explains why Prairie made the Prairie Loan, on behalf of whom Prairie made the Prairie Loan, which Webster bank account the Prairie Loan was deposited in, or the terms governing the Prairie Loan. Rather, the Second Amended Subrogation Agreement states that Prairie, as Pledgor, pledged, assigned, and transferred, for the benefit of Webster, a security interest in the cash comprising the Prairie Loan. (*Id.* at 12). It also states that the Prairie Loan is security for the prompt payment of the Webster Loan. (*Id.* at 13).[10] The Court

---

[10] The Second Amended Subrogation Agreement also states that Prairie, as a pledgor, acknowledges that, "as a shareholder of RFI or otherwise, as applicable, [Prairie] expect[s] to derive a financial benefit or other advantage

therefore finds that the Subrogation Agreements do not establish a creditor relationship between Prairie and RBC.

The Court also finds that the Subrogation Provision also does not establish Prairie's standing to bring the Motion. Indeed, the Subrogation Provision provides in relevant part, "[Pledgors] agree that . . . until the [Webster Loan] ha[s] been paid in full in cash and the [Webster Loan] is irrevocably terminated, [Pledgors will not] demand, receive, or accept any payment in any form or amount in respect of the Applied Amount . . . ." (RFI Docket No. 126-10 at 3 (§ 8 of the Second Amended Subrogation Agreement)). Stated succinctly, the Subrogation Provision contemplated that Webster could be paid in full and the Webster Loan terminated without the Pledgors being paid in full.

This result is important because the Pledge Agreement also terminated according to its terms when the Webster Loan was paid in full. (*See* Pledge Agreement § 14). The Subrogation Provision does not change this result, as Prairie was not a party to the Pledge Agreement and did not seek an amendment to the Pledge Agreement in order receive the rights thereunder.[11] Accordingly, the Prairie Loan, the Subrogation Agreements, and the Pledge Agreement do not establish a creditor or party in interest relationship sufficient to confer standing on Prairie in the RBC case.[12]

---

from the financial accommodations provided for in the [Webster Loan]." (*Id.* at 12). No similar provision identifies a relationship between Prairie and RBC.

[11] The Subrogation Provision provided that "[Webster] agrees to execute such documents reasonably requested by [Prairie] to effect such subrogation, all at Pledgor's expense and in form and substance satisfactory to [Webster]." (RFI Docket No. 126-10 at 3 (§ 8 of the Second Amended Subrogation Agreement)).

[12] Finally, though not raised in the Motion, Michael G. Barry states in the Barry Affidavit that the Trustee Financing provides a basis for Prairie's standing in the RBC case because the Court "granted Prairie a lien in regard to the assets of both RFI and RBC–the RBC Share[] and ownership of RBC (among other assets) are valuable assets diminished and damaged by the improper filing of the RBC bankruptcy." (Barry Affidavit at 3). The Court notes that the Trustee Financing *in the RFI case* granted Prairie a first priority security interest in any eventual recovery from litigation stemming from the Trustee's litigation. (RFI Docket No. 44). The Court further notes that all of the causes of action brought in the Adversary Proceeding seek recovery for the RBC estate, not the RFI estate. (See AP Doc. 1). The Court does not believe that the Trustee Financing in the RFI case makes Prairie a party in interest of RBC. However, even if it did, the Trustee has already recovered $400,000 from the settling defendants in the

For these reasons, the Court agrees with the Trustee that none of the Movants have

provided any documentation showing they are creditors or parties in interest of RBC.

(Opposition at ¶ 21). Accordingly, none of the Movants have standing to prosecute this Motion.

### B. **WHETHER CAUSE EXISTS TO DISMISS THE RBC PETITION**

Even if the Movants had standing to bring the Motion, the Court finds that the Movants

have not established that cause exists to dismiss the RBC case within the meaning of Section 707

of the Bankruptcy Code. *See* 11 U.S.C. § 707(a). The Movants raise two arguments regarding

why the RBC case should be dismissed for cause: (i) the Trustee lacked authority to file RBC's

bankruptcy petition under Florida corporate law (Memo in Support at ¶¶ 29–35); and (ii) the

Trustee was incapable of voting the RBC Share to authorize the bankruptcy petition because RFI

pledged and surrendered the RBC Share years before the bankruptcy petition was filed. (*Id.* at ¶¶

36–46).

The Court will examine these arguments in turn.

### 1. **The Trustee's Authority to File the RBC Petition**

The first argument advanced by the Movants is that the RBC case should be dismissed

because the Trustee lacked authority to file the RBC bankruptcy petition.  (*Id.* at ¶¶ 29–35).

In response, the Trustee asserts that: (i) the Movants lack standing to argue that the RBC

case was unauthorized (Opposition at ¶¶ 24–26); (ii) even if the Movants do have standing, the

Motion should be denied because the powers of a Trustee in bankruptcy allow trustees to file

bankruptcy petitions of subsidiaries (*id*. at ¶¶ 34–37); and (iii) the Trustee has the power to

---

Adversary Proceeding, which is sufficient to pay any purported lien in full, even if such lien arises in the RBC case.
(AP Docket No. 45). Accordingly, the Court finds that the Trustee Financing does not make Prairie a creditor or
party in interest of RBC.

amend the RBC bylaws to allow the shareholders to authorize the bankruptcy petition *nunc pro tunc*. (*Id.* at ¶¶ 38–44).

In the Reply, the Movants assert that: (i) they do, in fact, have standing to challenge whether a bankruptcy petition was properly authorized (Reply at 9–10); and (ii) the Trustee admits that she violated Florida law by filing the petition, and that the Trustee cannot fix this failure *nunc pro tunc*. (*Id.* at 14–17).

### a)  <u>The Movants Cannot Challenge the Trustee's Authority to File the RBC Petition</u>

As set forth above, the Trustee argues that the Movants cannot challenge the Trustee's authority to file the RBC petition because creditors are unable to plead statutory requirements not intended for their protection. (Opposition at ¶¶ 24–26).

In response, the Movants argue that it is irrelevant that they are not shareholders or members of the RBC board because the relevant inquiry is whether the "party raising the challenge has a stake in the case sufficient to entitle it to be heard." (Reply at 9–10).

The Court disagrees with the Movants. Courts have generally held that creditors cannot challenge a corporate bankruptcy filing on the grounds that it was not properly authorized. *In re Gucci*, 174 B.R. 401, 412 (Bankr. S.D.N.Y. 1994) (citing *In re John Hicks Chrysler–Plymouth, Inc.*, 152 B.R. 503 (Bankr. E.D. Tenn. 1992); *In re Pro. Success Seminars Int'l, Inc.*, 18 B.R. 75 (Bankr. S.D. Fla.1982*); In re Sw. Equip. Rental*, 152 B.R. 207 (Bankr. E.D. Tenn. 1992), *but see*, *In re Giggles Restaurant, Inc.*, 103 B.R. 549 (Bankr. D. N.J. 1989); *In re A–K Enters., Inc.*, 111 B.R. 149 (Bankr. N.D. Ohio 1990)).[13]

---

[13] As the United States Supreme Court held in a case decided under the Bankruptcy Act, this is so because "[c]reditors have no standing to plead statutory requirements not intended for their protection. If the stockholders' rights had been infringed, and they chose to waive them, a creditor could not assert them in opposing an adjudication." *Royal Indem. Co. v. American Bond & Mortg. Co.*, 289 U.S. 165, 171 (1933).

This is particularly true where, as here, the Movants are not even creditors or parties in interest of RBC. *See In re Gucci*, 174 B.R. at 412 (noting that "in determining whether a creditor has standing to seek a dismissal, the court should consider whether the party raising the challenge has a stake in the case sufficient to entitle it to be heard, taking into account the policies underlying the principles it invokes and the scope of protections intended to be afforded by those policies"). For this reason, the Court agrees with the Trustee that the Movants cannot move to dismiss the RBC petition on the grounds that it was unauthorized.

### b) Even if Movants had Authority to Challenge Authorization of the Petition, the Petition was Properly Authorized under Florida Law

Even if the Movants had authority to challenge the authorization of the RBC petition, the Movants' argument still fails as the petition was properly authorized as a matter of corporate law.

As set forth above, the Movants argue that under Florida law, the Trustee had no authority to file the RBC petition. (Memo in Support at ¶¶ 29–35). The Movants specifically argue that: (i) unauthorized bankruptcy petitions must be dismissed (*id.* at ¶ 29); (ii) in determining whether a petition has been properly authorized, courts look to state law and the instruments of incorporation (*id.* at ¶ 30); and (iii) under Florida law, which is applicable here, authorization must come from the board of directors and requires a board resolution (*id.* at ¶¶ 31–32). Accordingly, the Movants assert that, because the RBC petition was only purportedly authorized by the Trustee (in the RFI case) as 100% shareholder of RBC, the RBC petition was unauthorized and must be dismissed. (*Id.* at ¶ 33).

In response, the Trustee argues that: (i) the Movants should be barred from raising this argument by the equitable theory of laches because the RBC case has already been pending for more than two years (Opposition at ¶¶ 27–33); (ii) the expansive powers of a bankruptcy trustee allows trustees to file subsidiaries into bankruptcy (*id.* at ¶¶ 34–37); and (iii) the RBC Bylaws

permit the Trustee of RFI, as 100% shareholder of RBC, to amend the bylaws to allow

shareholders to ratify the RBC bankruptcy *nunc pro tunc*. (*id.* at ¶¶ 38–44).

In the Reply, the Movants argue that: (i) laches is inapplicable because it is only an

affirmative defense that is not available to defeat a challenge to the Court's jurisdiction (Reply at

10–14); (ii) in purporting to amend the bylaws to allow shareholders to authorize the RBC

bankruptcy, the Trustee admits that the RBC bankruptcy was unauthorized (*id.* at 14–17); and

(iii) the Trustee cannot fix the lack of proper authorization *nunc pro tunc*. (*Id.*)

Here, the Court agrees with the Trustee, although for somewhat different reasons.

In determining whether a bankruptcy petition was properly authorized, courts look to

applicable state law. *In re 3P Hightstown, LLC*, 631 B.R. 205, 210 (Bankr. D.N.J. 2021)

(collecting cases); *see also Price v. Gurney*, 324 U.S. 100, 106 (1945) (holding that if "those

who purport to act on behalf of the corporation have not been granted authority by local law to

institute the [bankruptcy], [the court] has no alternative but to dismiss the petition").

Movants rely on *Price* for the proposition that the RBC case must be dismissed because it

was not filed in the first instance by a party with authority to do so, and that such lack of

authority cannot be cured *nunc pro tunc*. (Reply at 14). However, Movants' reliance on *Price* is

misplaced. "Critically . . . *Price* did not address whether the required authorization under local

law could be found in ratification/relation back doctrine." *Hager v. Gibson*, 108 F.3d 35, 39 (4th

Cir. 1997); *see also In re Melbourne Beach, LLC*, No. 6:17-BK-7975-KSJ, 2019 WL 13189459,

at *3 (M.D. Fla. Nov. 5, 2019) (collecting cases under Florida law). As the Fourth Circuit

explained in *Hager*:

> [U]nder Virginia law, the unauthorized filing of a voluntary petition in bankruptcy
> [on] behalf of a corporation might be ratified in appropriate circumstances by
> ensuing conduct of persons with power to have authorized it originally. Under such
> circumstances, it could therefore serve as the local law source of the authority

required by *Price v. Gurney* for a voluntary bankruptcy filing [on] behalf of a corporation.

*Hager v. Gibson* 108 F.3d at 40.

Here, RBC is a Florida corporation, and resolution of this issue is therefore governed by Florida law. (Docket No. 113-7, Art. 12 (stating that the bylaws are to be construed under Florida law)). Under Florida law, "[a] principal can ratify the unauthorized act of an agent purportedly done on behalf of the principal either expressly or by implication through conduct that is inconsistent with an intention to repudiate the unauthorized act." *In re Mojo Brands Media, LLC*, No. 6:15-BK-03871-CCJ, 2016 WL 1072508, at *2 (Bankr. M.D. Fla. Mar. 16, 2016) (quoting *McDonald v. Hamilton Elec., Inc. of Florida*, 666 F.2d 509, 514 (11th Cir. 1982)). Likewise, a "principal may subsequently ratify its agent's act, even if originally unauthorized, and such ratification relates back and supplies original authority." *Id.* (quoting *Banyan Corp. v. Schucklat Realty, Inc.*, 611 So.2d 1281, 1282 (Fla.Dist.Ct.App.1992)). "The principal may adopt the unauthorized act expressly, either in writing or verbally, or impliedly, by accepting the benefits of the unauthorized act." *In re Melbourne Beach, LLC*, No. 6:17-BK-07975-KSJ, 2019 WL 10734081, at *5 (Bankr. M.D. Fla. Aug. 6, 2019) (citations omitted). However, for ratification to occur, "[t]he principal must have full knowledge of the initially unauthorized agents' conduct and approve of that conduct." *Id.* (quoting *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1355 (11th Cir. 2011)).

Here, RBC's bylaws provide that "all corporate powers shall be exercised by or under the authority of the board of directors, and the business and affairs of the corporation shall be managed under the direction of the board of directors." (RFI Docket No. 113-7, Art. 3, § 1). The RBC Board was comprised of Teeger (as chairman), Haber, and Afek. (RFI Docket No. 123-1 at

¶ 1). Accordingly, Teeger, Haber, and Afek were the parties who had the ability to ratify the Trustee's act of filing the petition at the time of filing.

The Court notes that Teeger, Haber and Afek have been involved in the RBC case essentially from its inception. The RBC case was filed on March 8, 2021. (RBC Docket No. 1). Shortly thereafter, on May 5, 2021, the Court entered an order designating Afek as the authorized representative of RBC. (RFI Docket No. 63). Additionally, Afek signed RBC's schedules on June 3, 2021. (RBC Docket No. 19). On June 7, 2021, the Trustee filed the Adversary Proceeding and named Teeger, Haber, and Afek as defendants. (AP Docket No. 1). The parties (including Teeger, Haber, and Afek) were ordered to mediation in the Adversary Proceeding. (AP Docket No. 22). Teeger, Haber, and Afek all participated in the mediation and reached a settlement with the Trustee resolving the claims against them in the Adversary Proceeding. (AP Docket No. 26). Moreover, when the Movants objected to the settlement, Teeger, Haber, and Afek, through counsel, filed responses to the objection. (AP Docket Nos. 38–39). Additionally, the Court notes that Teeger filed a declaration in support of the Trustee's Opposition to the instant Motion. (RFI Docket No. 123-1).

Taken together, Teeger, Haber, and Afek have each had knowledge of the RBC case since 2021 and have not moved to dismiss the RBC case, or otherwise challenged the RBC case on the grounds that it was not properly authorized.[14] For these reasons, the Court finds that

---

[14] The Court notes that, in the Teeger affidavit, Teeger states that "[i]mmediately following the sale to Roses which was approved by the [RBC] Board, RBC ceased all operations and as a result, the board ceased to function, and the board members effectively resigned." (RFI Docket No. 123-1 at ¶ 4). However, RBC's bylaws state that "[a] director may resign at any time by delivering written notice to the board of directors or its chairman or to the corporation. A resignation is effective when the notice is delivered unless the notice specifies a later effective date." (RFI Docket No. 113-7 at Art. 3 § 11). No party produced any written notice indicating that the RBC Board properly resigned pursuant to the RBC Bylaws. Indeed, at the Hearing in this matter, the Movants themselves argued that the board had not effectively resigned and therefore Teeger, Haber, and Afek remain members of the board. (See Hearing Transcript 81:13–82:3 (asserting that the Teeger affidavit is "an admission that the board members did not resign. . . . [T]hat's not how boards work. . . . The trustee should have contacted the board, and perhaps the trustee did. We do not know. . . . Those board members thought that they had effectively resigned . . . [b]ut they had not

Teeger, Haber, and Afek have implicitly ratified the Trustee's filing of the RBC bankruptcy through conduct inconsistent with an intent to repudiate the filing.

Finally, the Court notes that the Trustee attempted to amend the RBC bylaws *nunc pro tunc* as 100% shareholder of RBC to permit RBC shareholders to ratify the RBC bankruptcy. (Opposition at ¶¶ 38–44). In response, the Movants assert that the Trustee may not amend the bylaws *nunc pro tunc* to cure the unauthorized filing. (Reply at 14). As set forth above, the RBC bankruptcy was implicitly ratified by the board of directors, who had authority under Florida law to ratify the petition, so no shareholder vote was required.

However, to the extent shareholder authorization of the RBC bankruptcy was required, the Court finds that the Trustee, as the sole RBC shareholder, clearly authorized her own filing as set forth in the Resolution attached to the RBC petition. (*See* RBC Docket No. 1-1).[15] Thus, no amendment to the bylaws was required.

Accordingly, the Court finds that the RBC petition was properly authorized.

### 2.  <u>The Trustee Was Capable of Voting the Share</u>

The second basis advanced by Movants to dismiss the RBC case is that the Trustee was incapable of voting the RBC Share to authorize the bankruptcy petition because RFI pledged and surrendered the RBC Share under the Pledge Agreement and Surrender Agreement prior to the filing of the RBC bankruptcy petition. (Memo of Law at ¶¶ 36–41). The Movants also argue that, even if the Pledge Agreement was terminated, the RBC Share remains in the physical possession of Webster, meaning that the Trustee is incapable of voting it to authorize the RBC bankruptcy.

---

resigned.")). As no other purported board members have been identified, it appears that Teeger, Afek, and Haber were still RBC Board members as of March 8, 2021, when the RBC petition was filed.
[15] For the reasons set forth *infra*, section (IV)(B)(2), only the Trustee could have voted the RBC Share.

(Hearing Transcript 43:16–45:4). Finally, the Movants argue that the Trustee abandoned the RBC Share by not attempting to recover it from Webster. (Memo of Law at ¶ 42).

In response, the Trustee asserts that the Pledge Agreement terminated according to its own terms when Webster was paid in full and that the RBC Share was not sold to Roses as part of the Surrender Agreement and Roses UCC Sale. (Opposition at ¶¶ 45–47). The Trustee also asserts that, pursuant to Section 541 of the Bankruptcy Code, the Trustee does not need to have physical custody of the RBC Share to vote it and that she has not abandoned it pursuant to Section 554 of the Bankruptcy Code. (*Id.* at ¶¶ 48–49).

In the Reply, the Movants reassert that the Trustee does not enjoy status as an RBC shareholder because: (i) the Pledge Agreement remains in effect because Prairie has not been paid in full, meaning that Webster holds the share in trust for Prairie (Reply at 18–19); and (ii) the Default Letter bars return of the RBC Share to RFI because the Movants remain unpaid. (*Id.* at 19–20).

Preliminarily, given that the filing of the RBC bankruptcy did not require a shareholder vote as set forth above, the Court notes that this argument is, to some extent, irrelevant. However, even if the holder of the RBC Share needed to authorize the filing through a shareholder vote, the Court agrees with the Trustee that the Trustee had the ability to do so.

This is so because, as stated above and argued by the Trustee, the Pledge Agreement—whereby the RBC Share was pledged to Webster and no other party—terminated according to its terms when Webster was paid in full. (*See* Hearing Transcript 58:12–59:23; RFI Docket No. 113-8 at § 14). The Subrogation Agreement does not change this result because Prairie was not an original party to the Pledge Agreement and did not seek an amendment to the Pledge Agreement in order to obtain the rights thereunder. (RFI Docket No. 126-10 at 3 (§ 8 of the

Second Amended Subrogation Agreement)). Accordingly, by the express terms of the Pledge

Agreement, Webster was required to "deliver to [RFI] the [RBC Share] pledged by [RFI]" under

the Pledge Agreement. (RFI Docket No. 113-8 at § 14).

Additionally, as pointed out by the Trustee, the fact that the Trustee is not in physical

possession of the RBC Share is no bar to her voting it, and the Trustee has not abandoned the

RBC Share. (Opposition at ¶ 44–55). Section 541(a) of the Bankruptcy Code states that property

of the estate is comprised of all legal or equitable interests in property wherever located and by

whomever held. *See* 11 U.S.C. §§ 541(a)–(a)(1); *see also In re Arcapita Bank B.S.C.(C)*, 575

B.R. 229, 250–51 (Bankr. S.D.N.Y. 2017).[16] Moreover, Section 554(d) of the Bankruptcy Code

provides that estate property remains property of the estate until it is abandoned, following notice

to all creditors and a hearing. *See* 11 U.S.C. § 554(a); *see also In re Residential Capital, LLC*,

523 B.R. 24, 39 (Bankr. S.D.N.Y. 2014) (citing *Holta v. Zerbetz (In re Anchorage Nautical

Tours, Inc.),* 145 B.R. 637, 642 (9th Cir. BAP 1992)).

Here, the RFI estate holds a beneficial interest in the RBC Share and is therefore entitled

to step into the shoes of RFI, as sole shareholder of RBC, and exercise all rights that RFI has

with respect to that share. (Opposition at ¶ 2 (noting that RFI is the sole shareholder of RBC)).

Likewise, the Trustee has not abandoned the share. Accordingly, the Trustee was entitled to vote

---

[16] Movants argued at the Hearing in this matter that, by operation of Section 541(d) of the Bankruptcy Code, RFI
only held a legal interest in the RBC Share, so the RBC Share only became property of the estate for legal purposes,
not beneficial purposes. (Hearing Transcript 76:14–77:3). This, they assert, precludes the Trustee from voting the
share. (*Id.*) Movants miscomprehend Section 541(d). That section provides that "[p]roperty in which the debtor
holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured
by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to
service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection
(a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any
equitable interest in such property that the debtor does not hold." 11 U.S.C. § 541(d). However, here, RFI clearly
had an equitable interest in the RBC Share, so 541(d) is inapplicable. *See In re Braniff Int'l Airlines, Inc.*, 164 B.R.
820, 825 (Bankr. E.D.N.Y. 1994), *subsequently aff'd,* 101 F.3d 686 (2d Cir. 1996) (noting that bare legal title exists
where, for instance, the debtor merely holds property in trust for another party subject to a duty to reconvey it to the
rightful owner). If anything, it is Webster who holds the RBC Share in trust for the RFI estate. Accordingly, 541(d)
does not bar the Trustee from voting the RBC Share.

the RBC Share to authorize the RBC bankruptcy filing, to the extent such vote was even

required.[17]

## C. <u>THE BEST INTEREST OF PARTIES IN INTEREST</u>

Finally, as stated above, in determining whether cause exists to dismiss a Chapter 7 case,

the Court must examine "whether dismissal would be in the best interest of all parties in

interest." *In re Smith*, 507 F.3d 64, 72 (2d Cir. 2007) (quoting *In re Dinova*, 212 B.R. 437, 442

(B.A.P. 2d Cir. 1997)). Here, even if the Movants prevailed in establishing cause, the Court finds

that dismissal is not in the best interest of all parties in interest. Indeed, as outlined extensively

herein, none of the Movants are even creditors or parties in interest of RBC. Dismissal of the

RBC case—a case with 26 unsecured creditors asserting claims totaling $477,594.56 according

to the RBC claims register—could potentially deprive the Trustee of standing to pursue the

Adversary Proceeding from which the RBC estate may significantly benefit.[18] (*See* RBC Claims

Register). Accordingly, the Court finds that dismissal is not in the best interest of parties in

interest.[19]

---

[17] Movants also argued at the Hearing that Roses did not purchase the RBC Share at the Roses UCC Sale, and further noted that Roses themselves have stated in these proceedings that they did not purchase the RBC Share at the Roses UCC Sale. (Hearing Transcript 15:11–15). The Court therefore agrees and finds that the RBC Share was not transferred to Roses as part of the Roses UCC Sale.

[18] At the Hearing, Movants asserted that the filing of the RBC case was unnecessary given the relatively small creditor body and that the Trustee's primary motivation in filing the RBC case was to generate fees to pay herself. (Hearing Transcript 36:11–37:21). Clearly, however, this is not the case, particularly where, as here, the Trustee has already recovered $400,000 from the settling defendants and is pursuing the Movants for an additional $1,002,624. (Opposition at ¶ 17). Moreover, as RBC is a wholly owned subsidiary of RFI, any recovery in excess of the RBC claims plausibly inures to the benefit of the creditors of the RFI estate. *See* 11 U.S.C. § 726(a)(6).

[19] The Court also notes that the Trustee asserted that the Motion should be denied under the equitable theory of laches because the RBC case was filed on March 8, 2021, and the Motion was not filed until November 2, 2023. (Opposition at ¶¶ 27–33). Given the findings made above, the Court need not decide whether laches should bar the Motion. However, the significant delay between the filing of the RBC petition and the bringing of this Motion supply an additional basis for finding that dismissal is not in the best interest of all parties in interest, as the Trustee has already expended a significant amount of time and money into the RBC case.

## V.    <u>**CONCLUSION**</u>

For the foregoing reasons the Motion is DENIED.

**IT IS SO ORDERED.**

Dated: <u>April 19, 2024</u>
New York, New York

/S/ John P. Mastando III_____
HONORABLE JOHN P. MASTANDO III
UNITED STATES BANKRUPTCY JUDGE
