**UNITED STATES BANKRUPTCY COURT**
<u>**SOUTHERN DISTRICT OF NEW YORK**</u>

|  |  |
|---|---|
| In re:<br><br>Richardson Foods, Inc., *et al.*,<br><br>Debtors. | <u>**FOR PUBLICATION**</u><br><br>Chapter 7<br><br>Case No. 20-11203 (JPM)<br>(Jointly Administered) |

<u>**MEMORANDUM OPINION AND ORDER**</u>
<u>**DENYING MOTION FOR RECONSIDERATION**</u>

*A P P E A R A N C E S:*

**WHITE AND WILLIAMS LLP**
*Counsel for Doge Capital, LLC, and Randall Talcott*
7 Times Square, Suite 2900
New York, NY 10036
By:   Christopher Graham, Esq.

**DUNNINGTON BARTHOLOW & MILLER LLP**
*Counsel for Prairie Street Capital, Inc.*
230 Park Avenue, 21st Floor
New York, NY 10169
By:   Luke A. McGrath, Esq.

**TARTER KRINSKY & DROGIN LLP**
*Counsel for Deborah J. Piazza, Chapter 7 Trustee*
1350 Broadway, 11th Floor
New York, NY 10018
By:   Alex Spizz, Esq.

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

I.    **INTRODUCTION**

Pending before the Court is the *Motion for Reconsideration* (the "**Motion**") of Doge

Capital, LLC ("**Doge**"), Randall Talcott ("**Talcott**") and Prairie Street Capital, Inc. ("**Prairie**,"

collectively, with Doge and Talcott, the "**Movants**") of this Court's April 19, 2024,

*Memorandum Opinion and Order Denying Motion for an Order Dismissing the Chapter 7 Case*

*of Richardson Brands Company* (the "**Memorandum Opinion**" or "**Order**").  (RFI Docket Nos.

139–40, 140-1).[1]  The Movants—who this Court previously found did not have standing to file

their Motion to Dismiss the case of debtor Richardson Brands Company ("**RBC**")[2] (*see*

Memorandum Opinion at 13–20)—urge the Court to find that they do in fact have standing as

creditors of RBC based upon newly-discovered facts and new, controlling law.  Because the

Court finds that the Movants have not alleged new facts nor new, controlling law sufficient to

support the Motion, the Court DENIES the Motion.

The Motion is supported by the *Memorandum of Law in Support of Motion for*

*Reconsideration* (the "**Memo in Support**") (RFI Docket No. 140-1) and the *Certification of*

*Luke McGrath in Support of Motion for Reconsideration* (the "**McGrath Certification**").  (RFI

Docket No. 140-2).

---

[1] References to "**RFI Docket No.**" are to filings entered on the docket in *In re Richardson Foods, Inc. et al.*, No. 20-11203 (JPM) (Bankr. S.D.N.Y. May 15, 2020).  References to "**RFI POC No.**" are to claims on the RFI Claims Register.  References to "Bankruptcy Rule __" are to the Federal Rules of Bankruptcy Procedure. References to "Local Rule __" are to the Local Bankruptcy Rules for the Southern District of New York.  References to "FRCP __" are to the Federal Rules of Civil Procedure.

[2] References to "**RBC Docket No.**" are to filings entered on the docket in *In re Richardson Brands Company*, No. 21-10439 (JPM) (Bankr. S.D.N.Y. Mar. 8, 2021).  References to "**RBC POC No.**" are to claims on the RBC Claims Register.  The RBC case is being jointly administered with the above-captioned case. (RBC Docket No. 49).

In response to the Motion, Deborah J. Piazza in her capacity as Chapter 7 Trustee (the "**Trustee**") filed the *Memorandum of Law in Opposition of Motion for Reconsideration* (the "**Opposition**") (RFI Docket No. 145).

On June 28, 2024, the Movants filed the *Reply Memorandum in Further Support of Motion for Reconsideration* (the "**Reply**") (RFI Docket No. 147). In the Reply, the Movants seek reconsideration, in part, based upon the United States Supreme Court's recent decision in *Truck Ins. Exch. v. Kaiser Gypsum Co., Inc.* ("***Kaiser Gypsum***"), which had not been rendered at the time of the Memorandum Opinion or the Motion. *Kaiser Gypsum*, 602 U.S. 268 (2024); (Reply at 2-3). The Trustee sought relief to file a brief Sur-Reply solely to address *Kaiser Gypsum*. (RFI Docket No. 149). The Court granted the request on July 2, 2024 (RFI Docket No. 150), and the Trustee filed a Sur-Reply letter on July 1, 2024 (the "**Sur-Reply**") (RFI Docket No. 151).[3]

The Court has reviewed and considered the Motion, the Opposition, the Reply, the Sur-Reply, all supporting documentation, and the record as a whole.

## II.    JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1) and the Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

---

[3] The Supreme Court in *Kaiser Gypsum* found that an insurance company "with financial responsibility for bankruptcy claims is a 'party in interest' that may object to a Chapter 11 plan of reorganization." *Kaiser Gypsum*, 602 U.S. at 268. As discussed further below, this Court disagrees with Movants that the *Kaiser Gypsum* case has applicability in a chapter 7 case.

III.   **BACKGROUND**

A.  **THE DEBTOR'S ORGANIZATIONAL AND DEBT STRUCTURE**

The facts germane to this Motion are set forth in this Court's April 19, 2024, Memorandum Opinion, familiarity with which is assumed.[4]  (*See* Memorandum Opinion). Briefly restated, RBC was a Florida corporation based in Canajoharie, New York.  (*Id.* at 3). RBC manufactured a full line of candy products, and a seasoning product called Gravy Master. (*Id.*)  Richardson Foods, Inc. ("**RFI**") was a Delaware corporation that owned the single share of RBC stock (the "**RBC Share**"), representing 100% of the equity in RBC.  (*Id.*)  RFI was a holding company with no operations or employees. (*Id.*)

On February 5, 2018, RFI entered into a *Secured Promissory Note* with Doge (the "**Doge Loan**") in the amount of $900,000.  (*Id.* at 5).  On that same date, RFI entered into a *Secured Promissory Note* with Talcott (the "**Talcott Loan**," and together with the Doge Loan, the "**Doge and Talcott Loans**") in the amount of $100,000.  (*Id.* at 5-6).  As part of the Doge and Talcott Loans, Doge and Talcott were granted liens against all of RFI's assets, subordinate to a lien granted in favor of Webster Business Credit Corporation ("**Webster**") pursuant to a December 24, 2014 *Credit and Security Agreement* (the "**Webster Loan**").[5]  (*Id.* at 6).  On March 22, 2018, Doge and Talcott filed UCC Financing Statements to secure their interests in RFI's assets in Delaware.  (*Id.* at 6).

---

[4] For the avoidance of doubt, defined terms utilized in this opinion have the same meaning as defined in the Memorandum Opinion unless expressly stated otherwise.

[5] As is relevant here, the Webster Loan identified as collateral essentially all of RFI and RBC's assets.  As part of the Webster Loan, RFI and Webster also entered into the *Subsidiary Pledge Agreement* (the "**Pledge Agreement**") on the same date.  Under the Pledge Agreement, RFI pledged the RBC Share to Webster and agreed, *inter alia*, not to vote the RBC Share to liquidate the company.  The Pledge Agreement also provided that the Pledge Agreement would terminate upon the Webster Loan being paid in full.  Webster filed UCC Financing Statements against RFI in Delaware and against RBC in Florida, identifying as its collateral all assets of both entities.

The following year, on August 23, 2019, Webster, Founders Equity I LP ("**Founders**"), RFI, RBC, and Prairie entered into the *Amended and Restated Cash Collateral Deposit Agreement* (the "**First Amended Subrogation Agreement**"). (RFI Docket No. 126-10). The purpose of the First Amended Subrogation Agreement was to reflect the fact that Prairie had "deposit[ed] and pledge[d] . . . $280,000 into Account No. 717800902_ maintained at Webster [] . . . to be held by [Webster] as collateral security for the [Webster Loan] . . . ." (the "**Prairie Pledge**"). (*Id.* at 2–3).

On October 24, 2019, Webster, Founders, RFI, RBC, Prairie, Haber, and Teeger entered into the *Second Amended and Restated Cash Collateral Deposit Agreement* (the "**Second Amended Subrogation Agreement**," and collectively with the First Amended Subrogation Agreement, the "**Subrogation Agreements**"). (*Id.* at 11–18). The purpose of the Second Amended Subrogation Agreement was to reflect the fact that Founders, Haber and Teeger (together, with Founders and Prairie, the "**Pledgors**") had deposited and pledged additional funds (the "**Pledged Collateral**") into bank accounts maintained at Webster, to be held by Webster as additional collateral security for the Webster Loan. (*Id.* at 12). The Second Amended Subrogation Agreement "amend[ed] and restate[d]" the Original Cash Collateral Agreement and the First Amended Subrogation Agreement in their entirety and was "made in substitution for and not in satisfaction thereof."[6] (*Id.* at 15 (§ 17 of the Second Amended Subrogation Agreement)); (*see also* Memorandum Opinion and Order, pp. 6-7).

The Second Amended Subrogation Agreement also provided that the Pledgors assigned, transferred, and pledged to Webster for its benefit a security interest in the Pledged Collateral.

---

[6] Though not in the record, it appears that the original Cash Collateral Deposit agreement (the "Original Cash Collateral Agreement") was between Webster, Founders, RFI, and RBC to reflect the fact that Founders had deposited $380,000 into the Debtors' bank account maintained at Webster, to be held as collateral security for the Webster Loan.

(*Id.* at 12–13 (§ 4 of the Second Amended Subrogation Agreement)).  The Second Amended

Subrogation Agreement further specified that the Pledged Collateral is security for the Webster

Loan.  (*Id.* at 13 (§ 5 of the Second Amended Subrogation Agreement)).

On March 9, 2020, Webster, RFI, and RBC signed the *Acknowledgement of Events of*

*Default* (the "**Default Letter**").  (*Id.* at 9).  Due to the default, RFI and RBC surrendered all their

collateral under the Webster Loan to Webster, consented to a private sale to Roses Holdings

Limited ("**Roses Holdings**"), and acknowledged that they had no remaining right to redeem the

collateral.  (*Id.*).  The Default Letter contemplated that, in exchange for the Webster Loan

collateral, Roses Holdings would pay $2,510,871.66 to Webster to satisfy the Webster Loan in

full and make the following payments pursuant to the Subrogation Agreements: (i) $442,732.60

to Founders; (ii) $228,717.95 to Prairie; (iii) $110,274.72 to Teeger; and (iv) $110,274.73 to

Haber.  (*Id.* at 9).  The Default Letter also contemplated that Roses Holdings would attempt to

collect RBC and RFI's outstanding accounts receivable following the sale and would distribute

70% of any accounts receivable collected first to Prairie up to $51,282.05, and thereafter on a pro

rata, *pari passu* basis to Prairie up to $1,100,175.97, and Talcott up to $122,241.78.  (*Id.*).

On that same date, Webster, as seller, and Roses Confections L.P. ("**Roses**

**Confections**"), an affiliate of Roses Holdings, as buyer, entered into the Secured Party General

Conveyance and Bill of Sale (the "**Roses UCC Sale**").  (*Id.*).  The Roses UCC Sale provided for

a sale that was substantially the same as that contemplated by the Default Letter.  (*Id.*).

## B.  THE BANKRUPTCY PROCEEDINGS

On May 15, 2020, Doge, Three Oaks Advisors, LLC, and Talcott filed an involuntary

chapter 7 bankruptcy petition against RFI.  (Opposition, ¶ 11).  The Court entered an order for

relief on July 1, 2020, and Deborah J. Piazza was duly appointed as Chapter 7 Trustee of RFI later that month. (*Id.*)

On December 28, 2020, the Trustee filed the *Motion to Approve Trustee in Bankruptcy Financing Pursuant to 11 U.S.C. § 364(c)(2)* (the "**Trustee Financing Motion**"). (RFI Docket No. 36). In the Trustee Financing Motion, the Trustee sought financing from Prairie (the "**Trustee Financing**") to "conduct an investigation into the [Roses UCC] Sale to determine if the [Roses UCC] Sale was for fair consideration as well as [investigate] the disposition of the proceeds of the Sale." (*Id.* at 5).

Thereafter, the Trustee conducted discovery in the RFI case and determined that RBC may have claims for actual and constructive fraudulent conveyances stemming from what the Trustee characterizes as "a flawed sale process of RBC's assets designed only to benefit Webster, the Debtors' insiders, and the Movants." (Opposition, ¶ 16). Accordingly, the Trustee filed a voluntary Chapter 7 petition on behalf of RBC on March 8, 2021, to preserve these potential claims (the "**RBC Case**"). (*Id.*). Attached to the RBC petition was a resolution (the "**Resolution**"), dated March 8, 2021, which stated:

> I[,] Deborah Piazza, the Chapter 7 trustee ("Trustee") of Richardson Foods, Inc., the 100% shareholder of Richardson Brands Company ("RBC") have in the exercise of my business judgement and in accordance with my fiduciary duties determined it is in the best interest of RBC, its creditors and other parties in interest that it seek relief under the provisions of Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") and accordingly I have authorized my attorneys Tarter Krinsky & Drogin LLP to file a Chapter 7 bankruptcy petition and any other documents required by the Bankruptcy Code, Federal Rules of Bankruptcy Procedure and the local rules of the United States Bankruptcy Court for the Southern District of New York on behalf of RBC.

(RBC Docket No. 1-1).

On March 15, 2021, the Trustee filed the *Notice of Possible Payment of Dividends and of Last Date to File Claims* (the "**Bar Date Notice**") setting a claims bar date in the RBC case of

7

June 17, 2021.  (RBC Docket No. 14).  The Trustee filed RBC's amended schedules (the "**RBC Schedules**") on June 3, 2021.  (RBC Docket No. 19).[7]  The schedules identified Doge as the holder of a $2,500 unsecured claim that was not contingent, unliquidated, or disputed.  (*Id.* at 15).  Prairie and Talcott were not listed in the RBC Schedules.

On June 7, 2022, the Trustee commenced an adversary proceeding[8] (the "**Adversary Proceeding**") against the Movants, Webster, Roses Holdings, Roses Limited, Roses RE Holdings, LLC ("**Roses RE**" and together, with Roses Holdings and Roses Confections, "**Roses**"), Founders, Teeger, Haber, and Afek seeking recoveries for fraudulent conveyances.  (Opposition, ¶ 17).  On January 10, 2023, this Court approved a partial settlement with all the defendants except the Movants whereby the settling defendants agreed to pay $400,000.00 in full settlement of the Trustee's claims.  (*Id.*)  The Trustee seeks the following amounts from the Movants in the Adversary Proceeding: $696,517 from Doge, $228,717 from Prairie, and $77,390 from Talcott.  (*Id.*)

Subsequently, the Movants filed a *Motion for an Order Dismissing the Chapter 7 Case of Richardson Brands Company* (the "**Motion to Dismiss**").  (RFI Docket No. 113-1[9]).  In response to the Motion, the Trustee filed the *Memorandum of Law in Opposition to Motion for an Order Dismissing the Chapter 7 Case of Richardson Brands Company* (the "**Opposition to the Motion**

---

[7] The Trustee filed RBC's initial schedules on March 10, 2021.  (RBC Docket No. 5).

[8] The Adversary Proceeding is pending at *Piazza v. Afek et al.*, No. 22-01103 (JPM) (Bankr. S.D.N.Y. Jun. 7, 2022).  References to "**AP Docket No.**" are references to filings on the Adversary Proceeding docket.

[9] In the Motion to Dismiss, the Movants sought dismissal of the RBC case pursuant to Section 707(a) of the Bankruptcy Code, asserting that: (i) the Trustee lacked authority to file RBC's bankruptcy petition under Florida corporate law; and (ii) the Trustee was incapable of voting the RBC Share to authorize the bankruptcy petition because RFI pledged and surrendered the RBC Share years before the bankruptcy petition was filed.  (Motion to Dismiss at 12).

**to Dismiss**").[10]  (RFI Docket No. 122).  Following the Trustee's Opposition to the Motion to

Dismiss, the Movants filed a Reply.  (RFI Docket No. 126).

This Court issued its Memorandum Opinion and Order on April 19, 2024, denying the

Motion to Dismiss because the Movants did not have standing and failed to establish "cause"

pursuant to 11 U.S.C. § 707.  (Memorandum Opinion and Order).  The Court found, *inter alia*,

that Movants did not have standing because they were not "parties in interest" in the RBC case.

(*Id.* at pp. 13-16).  The Court determined that the Movants were not parties in interest because: 1)

their standing based on the adversary proceeding did not make them "parties in interest"; 2)

Doge and Talcott, individually, did not present evidence showing an obligation owed by RBC,

conferring them "creditor" status; and 3) Prairie, individually, is similarly not a creditor or party

in interest as to RBC.  (*Id.*).  Further, this Court ruled that even if the Movants had established

standing, there was no "cause" to dismiss the case pursuant to Section 707 of the Bankruptcy

Code because the Trustee: 1) did have authority to file the RBC Claim; 2) had the ability to vote

the share of RBC to authorize the bankruptcy filing; and 3) did considerable work in the RBC

case and the adversary proceeding so dismissal would not be in the best interests of creditors.

(*Id.* at pp. 20-29).  The Court further determined that the Movants did not have authority to

challenge the corporate bankruptcy filing, but even if the Movants had authority, the RBC

petition was properly authorized under Florida Law because the board of directors implicitly

---

[10] The Trustee asserted that the Movants lack standing because they are not creditors or parties in interest to RBC
and even if they were creditors, they lack standing because creditors are unable to file a motion to dismiss based on
the grounds that the board of directors did not authorize the filing.  (Opposition to Motion to Dismiss, at ¶¶ 20-23,
24-26).  The Trustee further argued that even if the Movants had standing, the Motion should be denied because (i)
the powers of a Trustee in bankruptcy allow trustees to file bankruptcy petitions of subsidiaries (*Id.* at ¶¶ 34-37); (ii)
the Trustee has the power to amend the RBC bylaws to allow the shareholders to authorize the bankruptcy petition
*nunc pro tunc* (*Id.* at ¶¶ 38-44); (iii) the Trustee can vote the RBC Share because the Pledge Agreement terminated
upon payment in full at the Roses UCC Sale (*Id.* at ¶¶ 45-47); (iv) the Trustee did not abandon or surrender the
interest in the RBC stock (*Id.* at ¶¶ 48-55); (v) only the Trustee has the power to vote the RBC Share (*Id.* at ¶¶ 56-
57); and (vi) the Motion is barred by the equitable theory of laches. (*Id.* at ¶¶ 27-33).

ratified the actions of the Trustee.  (*Id.* at pp. 22-26).  This Court then found that the Trustee had

the ability to vote the RBC Share held by RFI to authorize the RBC Petition because the Pledge

Agreement terminated upon the Sale to Roses.  (*Id.* at p. 27).  Lastly, this Court held that

dismissal was not in the "best interests of creditors" under Section 707 given the mediation

settlement achieved by the Trustee in the Adversary Proceeding.  (*Id.* at p. 29).  Based on these

reasons, the Court denied the Motion to Dismiss.

### C. <u>THE MOTION TO RECONSIDER</u>

Following the Memorandum Opinion and Order, the Movants filed the Motion to

Reconsider asking the Court to reconsider its Order denying the Motion to Dismiss.  (Motion, p.

1).  The Movants revisit their original points by arguing that the RBC case should be dismissed

because: 1) the Movants now have standing due to tardy proofs of claims filed by Doge, Talcott,

and Prairie (RBC POC Nos. 27-1, 28-1, 29-1) (the "**Movant's Claims**"); 2) the RFI board of

directors did not, and could not, ratify the Trustee's filing of the RBC petition; 3) the Pledge

Agreement was not terminated as it was already amended; and 4) the Pledge Agreement was

amended by the Subrogation Agreement.[11]  (*Id.*)

In response, the Trustee argues in the Opposition that the Movants still lack standing, as

the Movants: 1) lacked standing at the time of filing the Motion to Dismiss; 2) failed to present

new facts or law in the Motion; and 3) do not hold a contingent claim against the RBC debtor.

(RFI Docket No. 145).  The Trustee also responds on the issue of authorization, asserting that: 1)

the Movants still lack authorization to challenge the bankruptcy petition; 2) the board of directors

had the authority to implicitly ratify the Trustee's action of filing the RBC petition; 3) the Pledge

---

[11] The Movants requested that the Motion to Reconsider be held in abeyance until a decision on the Movants' *Joint Motion for Entry of Order Substantively Consolidating the Estates of Richardson Foods, Inc. and Richardson Brand Company* (the "**Substantive Consolidation Motion**").  (RFI Docket No. 97).  The Court denies that request and will separately set a schedule for the Substantive Consolidation Motion.

Agreement and Subrogation Agreement cannot be read in tandem, as they are each separate

agreements; 4) Prairie did not satisfy the requirements for equitable subrogation; and 5) the

Movants failed to present evidence that dismissal is in the best interests of creditors.  (*Id.*).

The Court granted the Movants leave to file a Reply.  (RFI Docket No. 147).  In their

Reply, the Movants assert: 1) that they have standing as creditors based on the Supreme Court's

decision in *Kaiser Gypsum*, which broadens the definition of "parties in interest" under Section

1109 of the Bankruptcy Code; 2) that they have presented new evidence in support of their

standing as creditors; 3) that they have valid claims against RBC and therefore are creditors; and

4) reassert the Trustee's lack of authorization.  (*Id.*).

Based on the above, the Trustee sought, and was granted, relief to file the Sur-Reply

solely to address the Supreme Court decision in *Kaiser Gypsum*.  (Sur-Reply, ¶¶ 1-8).

The Court will address these issues in turn.

## IV.    LEGAL STANDARDS AND DISCUSSION

### A.    STANDARDS UNDER FRCP RULES 59 AND 60

The Federal Rules of Civil Procedure do not specifically provide for a motion for

"reconsideration."  *See Lopez v. Goodman*, No. 10-CV-6413 CJS, 2013 U.S. Dist. LEXIS

135046, at *1 (W.D.N.Y. Sept. 20, 2013) (citing *Hamilton v. Williams*, 147 F.3d 367, 371 n.10

(5th Cir. 1998)).  However, such a motion may be considered as a motion to alter or amend

judgment under Rule 59(e) or for relief from judgment or order under Rule 60(b).  *See Osterneck

v. Ernst & Whinney*, 489 U.S. 169, 174 (1989).

"Rule 9023 of the Federal Rules of Bankruptcy Procedure incorporates FRCP 59, which

allows a party to move to alter or amend a judgment."  *See In re Celsius Network LLC*, 2024

Bankr. LEXIS 2552, at *5 (Bankr. S.D.N.Y. October 17, 2024).  Furthermore, Bankruptcy Rule

9023-1(a) provides that a motion for reargument of a court order determining a motion "must set

forth concisely the matters or controlling decisions which counsel believes the Court has not

considered." *Id*. In addition, Bankruptcy Rule 9024 incorporates FRCP Rule 60, which details

six grounds upon which relief from judgment may be granted. *Id.* ("Bankruptcy Rule

9024 incorporates FRCP 60, which authorizes relief from a final order under certain

circumstances."); *see also In re Eletson Holdings Inc.*, 2024 Bankr. LEXIS 13, at *9 (Bankr.

S.D.N.Y. January 4, 2024).

A motion for reargument under Bankruptcy Rule 9023 "shall be filed . . . no later than 14

days after entry of judgment." Bankruptcy Rule 9023. If a motion for reargument is filed after

the fourteen-day period specified in Bankruptcy Rule 9023, "the Court will treat the Motion as a

motion for relief from judgment under Bankr. Rule 9024 and Civ. Rule 60."[12] *See In re Enron

Corp.*, 352 B.R. 363, 368 (Bankr. S.D.N.Y. 2006) (internal citations omitted)[13]; *see also United

States v. Clark*, 984 F.2d 31, 34 (2d Cir. 1993) (motion for reconsideration pursuant to Rule 59 is

only available within the applicable time period). In a similar case, *Williams v. Brown and Root

Inc.*, the Fifth Circuit held that a motion to set aside dismissal for want of prosecution would be

considered under FRCP Rule 60 because it had not been filed within the period to file a motion

pursuant to Rule 59(e). *See Williams v. Brown and Root Inc.*, 828 F.2d 325, 328 (5th Cir. 1987).

The Movants elected to proceed under both FRCP Rules 59(e) and 60. (Motion, ¶¶ 8, 9).

However, the Movants fail to specify which Bankruptcy Rule applies or to support the Motion

with caselaw on reconsideration. (*See id.* ¶¶ 4, 5, 7, 9, 11) (requesting that "the Court should

reconsider its Order"). The Movants filed the Motion on May 3, 2024, which was the 14th day

---

[12] The Bankruptcy Rules mirror the Federal Rules in that both statutes impose a deadline by which to file Motions for Reargument. *See Hamilton v. Williams*, 147 F.3d at 371 n.10 (Motions not timely filed under Rule 59(e) must be treated as motions filed under Rule 60(b)).

[13] The Court in *Enron* found that the applicable rule to proceed under was FRCP Rule 60 because the motion to reconsider in the case had been filed after the time specified in FRCP Rule 59(e) had expired.

following entry of the Court's Memorandum Opinion and Order denying the Movant's Motion to

Dismiss. (RFI Docket Nos. 139, 140-1). While the Court believes the Motion is most

appropriately construed under Bankruptcy Rule 9023, for the avoidance of doubt, the Court will

also consider the factors under Bankruptcy Rule 9024. *See In re Flatbush Square Inc.*, 508 B.R.

563, 569 (Bankr. E.D.N.Y. 2014) (motion to reconsider was filed 14 days after the Court's order

and was thus considered under Bankruptcy Rule 9023); *see also In re Celsius Network LLC*,

2024 Bankr. 2552, at \*\* 4-5 (noting that some courts analyze motions for reargument under

either FRCP Rule 59(e) or Rule 60 as both standards have similar considerations).

While Bankruptcy Rule 9023 does not provide specific grounds for reconsidering a

judgment, under FRCP Rule 59(e), courts consider the following: "an intervening change of

controlling law, the availability of new evidence, or the need to correct a clear error or prevent

manifest injustice." *See In re Flatbush Square Inc.*, 508 B.R. at 569 (internal citations omitted).

In addition, Rule 9024 incorporates the six grounds for relief in FRCP Rule 60(b),

including:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been
discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or
misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier
judgment that has been reversed or vacated; or applying it prospectively is no longer
equitable; or

(6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b); *see also* Bankruptcy Rule 9024.

The movants bear "a heavy burden because Rule 60 provides extraordinary relief and is, therefore, generally viewed with disfavor." *In re Celsius Network LLC*, 2024 Bankr. LEXIS 2552, at *6 (*citing In re Barquet Grp., Inc.*, 477 B.R. 454, 460 (Bankr. S.D.N.Y.), *aff'd*, 486 B.R. 68 (S.D.N.Y. 2012)).

In general, any motion for reconsideration "is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'" *See Seoul Viosys Co., Ltd. v. P3 Int'l Corp.*, 2017 U.S. Dist. LEXIS 196203, at *3 (S.D.N.Y. November 29, 2017). As noted by the Second Circuit Court of Appeals, "[t]he standard for granting a [motion for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *See Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) (holding that a motion for reconsideration should only be granted if the moving party can introduce a change in the law or facts the court had not considered).

Under these standards, the Court will address the Movants' arguments pursuant to Bankruptcy Rules 9023 and 9024.

**B.   THE MOVANTS HAVE NOT PRESENTED ANY NEWLY-DISCOVERED EVIDENCE NOR ANY INTERVENING CHANGE IN CONTROLLING LAW AS TO THEIR STANDING IN THE RBC CASE**

In support of the Motion, the Movants first rely on the filing of their tardy claims, presumably under Rule 9023, which requires the movant to demonstrate the "availability of new evidence" to prevail on reconsideration. *See Associated Press v. U.S. Dep't of Def.*, 395 F. Supp. 2d 17, 19 (S.D.N.Y. 2005) ("motion for reconsideration is neither an occasion for repeating old arguments previously rejected nor an occasion for making new arguments that could have been

previously advanced"). The arguments also appear to implicate subsection (b)(2) of Rule 60 which requires a showing of "newly discovered evidence." To meet the standard under "newly discovered evidence," the evidence "must have been previously unavailable." *GenCorp, Inc. v. Am. Int'l Underwriters,* 178 F.3d 804, 834 (6th Cir. 1998). Therefore, the issues will be addressed under this standard.

The Movants also appear to rely on the Supreme Court decision in *Kaiser Gypsum* as evidence of "an intervening change of controlling law" to urge the Court to reconsider its Motion to Dismiss.

### 1. **Movants' Tardy Claims Are Neither New Information Nor Sufficient to Establish Movants as Creditors.**

#### a. **The Proofs of Claims Filed By The Movants In the RBC Case Do Not Constitute "New Information" Supporting Reconsideration.**

The Movants argue that the "Court should reconsider its standing analysis because the parties have, contemporaneously with this filing, filed proof of claims against RBC and, thus, have standing." (Motion, ¶ 14). Doge filed an unsecured proof of claim in the amount of $2,562,124.42. (RBC POC No. 27-1). Prairie filed an unsecured proof of claim in the amount of $6,002,915.32. (RBC POC No. 28-1). Talcott filed an unsecured proof of claim in the amount of $119,312.36. (RBC POC No. 29-1). All claims were filed on May 3, 2024. (RBC Case, Claims Register). The Movants assert that the late-filed claims address this Court's Memorandum Opinion and Order, which they argue "acknowledged that Doge (and thus, Talcott and Prairie) can file 'a tardy proof of claim that would entitle it to distribution in the RBC case.'" (Motion, ¶ 14) (internal citations omitted). The Movants now assert that these proofs of claim have cured their lack of standing. (*Id.* at ¶¶ 14-15).

In the Trustee's Opposition, the Trustee asserts that the Movants did not have standing at the time they filed their Motion to Dismiss. (Opposition, p. 7). The Trustee argues that the

Movants are attempting to present new evidence as to standing that they did not present in their Motion to Dismiss. (*Id.* at p. 9). The Trustee emphasizes that the Movants' prior filing did not reference Rule 3002(a) and filing proofs of claims. (*Id.*). The Trustee stresses that "the Movants failed to have standing when they brought the Motion to Dismiss under Rule 3002, 11 U.S.C. § 1109 or Article III and cannot now artificially create it."[14] (*Id.*).

In their Reply, the Movants reaffirm that they have standing because the Movants have claims against RBC. (Reply, ¶ 7). The Movants emphasize that even though they filed a tardy proof of claim, this does not defeat a "creditor's standing to participate in the bankruptcy case." (*Id.* at ¶ 9). The Movants then cite to Bankruptcy Rules 9023 and 9024 to establish their right to present "new" evidence by stating that, "a party may move for relief from final judgment where *newly discovered* evidence is presented that, with reasonable diligence, could not have been discovered in time to move for a new trial . . . .". (*Id.* ¶ 11) (emphasis added). The Movants assert that they have filed proofs of claim against RBC pursuant to 11 U.S.C. § 727(a)(3) for the avoidance of doubt and that this "*newly presented* evidence" was not available when the Movants filed the Motion to Dismiss. (*Id.*) (emphasis added). The Movants conclude that they are creditors and "did not need to file proofs of claim" to have standing, which is established by their prepetition relationship with RBC. (*Id.* at ¶ 12).

The Court finds that the filed proofs of claim are not "new evidence" in support of the Movants' standing because the information supporting the alleged claims was available to Movants prior to filing the Motion to Dismiss. The RBC case was filed on March 8, 2021. (RBC Petition). The Motion to Dismiss was filed on November 2, 2023. (RBC POC Nos. 27-

---

[14] Although not addressed in the Movants' Motion, the Trustee raises the argument that the Movants do not have Article III standing. (*See* Opposition, p. 9). While the Movant's argued their Article III standing in the Motion to Dismiss, the Memorandum Opinion and Order does not address Article III standing, therefore the Court will not address the issue here.

29).  The Memorandum Opinion and Order denying the Motion to Dismiss was entered on April

19, 2024.  (RFI Docket No. 139).  The Movants subsequently filed the claims on May 3, 2024.

(RBC Case, Claims Register).  In the proofs of claim, the Movants rely on evidence used in the

*Motion for Substantive Consolidation*, filed on April 26, 2023, which was filed prior to the

Motion to Dismiss, to support the proofs of claim.  (RBC Case, Claims Register).  For example,

in support of the Doge claim, Doge cites to exhibits included in the *Motion for Substantive*

*Consolidation* (RFI Docket No. 97), which was filed over a year prior to the filing of the claims.

(RBC POC No. 27-1).  There is no evidentiary support for the Talcott and Prairie claims.  (RBC

POC Nos. 28-1, 29-1).

Moreover, the Movants assert (as evidence that their claims are not "contingent") that the

alleged claims "arose in 2018 and 2019, long before the RBC petition was filed."  (Reply, ¶ 15).

Yet the parties did not file proofs of claim nor raise this as evidence in support of standing in

their original Motion to Dismiss.  (RFI Docket No. 113).  The claims were only filed after the

parties misunderstood the Court's ruling in the Opinion as tacit approval to cure standing by

filing claims.[15]  (Memorandum Opinion and Order, p. 17).

Based on this, the evidence in support of the alleged claims was clearly available to

Movants prior to the filing of the Motion to Dismiss.  While the Movants cite to the correct

standard that "newly discovered evidence . . . that could not have been discovered in time"[16] can

support a motion for reargument, this is not reflected in the record as the evidence in support of

---

[15] The Court in its Memorandum Opinion and Order found that: ". . . the Movants are correct that Doge can file a
tardy proof of claim that would entitle it to distribution in the RBC case . . . ."  (Opinion, p. 17).  This presumed that
any claims that would be filed would have evidentiary support and would establish the Movants as creditors in the
case.  As will be explained below, the Movants have not established their standing as creditors in the RBC Case.
[16] By their own statements, the Movants do not have standing.  The Movants conflate "newly discovered evidence"
with "newly presented evidence."  (Reply, ¶ 11).  By definition, "newly presented" confirms that the Movants had
access to the information but until the denial of their Motion to Dismiss, did not raise this argument with parties or
this Court.

the newly-filed claims was available prior to the filing of the Motion to Dismiss.  (Reply, ¶ 11);

*see also Seoul Viosys Co.*, 2017 U.S. Dist. LEXIS 196203 at * 3 (motion for reargument is not

"an opportunity to raise new arguments not previously presented to the Court in the original

Motion to Dismiss").  As Courts have held, a motion for reconsideration should not be used as a

vehicle for "presenting the case under new theories, securing a rehearing on the merits, or

otherwise taking a 'second bite at the apple.'"  *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d

Cir. 1998).  A party is not permitted to raise new arguments not previously presented to the

Court in the original pleading.  *See Seoul Viosys Co.*, 2017 U.S. Dist. LEXIS 196203 at * 3.  The

Court in *Seoul Viosys* disposed of the Movant's arguments that the Court overlooked certain

legal precedent because the issues raised in the motion to reconsider had already been discussed

or were "new arguments not previously presented to the Court."  *Id.*, at * 3; *see also Shrader*, 70

F.3d at 257 ("a motion to reconsider should not be granted where the moving party seeks solely

to relitigate an issue already decided.").

Furthermore, the Movants cannot retroactively create standing by filing claims well into

the case.  The submission of new evidence is limited to evidence that was not previously

available.  *Davidson v. Scully*, 172 F. Supp. 2d 458, 463 (S.D.N.Y. 2001) (denying motion for

reconsideration because the movant was attempting to reargue its earlier motion and "vent his

frustration" with the court's prior ruling, which is not the purpose of a motion for

reconsideration).  Indeed, a motion for reconsideration should not be used "to put forward

additional arguments which the movant could have made but neglected to make before

judgment."  *See Goldstein v. State of New York*, 2001 U.S. Dist. LEXIS 11318, at *1 (S.D.N.Y.

Aug. 7, 2001).

18

Ultimately, the Movants' standing derives from their manufactured status as creditors, which was created from evidence available to the Movants prior to the Motion to Dismiss.

### b. Even If The Claims Were "New Information," The Claims Do Not Establish the Movants as Creditors of RBC.

As discussed above, the Movants argue that the Court should reconsider its standing analysis because the Movants have each filed a proof of claim against the RBC debtor. (Motion, ¶ 4); (*see also* RBC POC Nos. 27-29).

In the Opposition, the Trustee states that the Movants "attempt to make the argument that RBC is an alter ego of RFI, thus, they have the right to file a claim against RBC. This argument is based on the contingency that this Court rules in favor of the Movants on the Joint Motion to Substantively Consolidate the Estates of Richardson Foods, Inc. and Richardson Brands Company." (Opposition, p. 10).

In the Reply, the Movants state that the Trustee "incorrectly characterizes the Movants' claims as contingent – they are not . . . ." (Reply, ¶ 13). Movants continue to argue that they "have standing because, they are creditors of RBC, [and] they have a claim against RBC." (*Id.* at ¶ 15).

In addition to the fact that there has been no new evidence presented that the Movants have standing, this Court agrees with the Trustee that the Movants do not have standing as alleged claimants of RBC because there is no privity between RBC and Movants that could establish a claim, contingent or otherwise. (*See* Reply, ¶¶ 7, 10); (*see also* Opposition, pp. 11-12). Filing tardy proofs of claim does not entitle the Movants to standing unless the Movants can establish their interests against RBC. However, the Movants are unable to do so.

### i.    There Is No Privity Between Movants And RBC.

The Court will address this issue as a threshold matter.[17]  Movants argue that they have

standing as creditors because they filed claims in the RBC case.  (Motion, ¶ 14); (*see also* Reply,

¶ 15).  In support of the $900,000 claim, Doge attached a statement signed by Managing

Member, Michael Barry (the "**Barry Statement**") stating that "per the 2018 Agreement, Doge

Capital advanced Richardson $900,000."  (RBC POC No. 27-1, ¶ 3).  In further support of the

claim, Doge asserts that "proof of a $900,000 initial loan payment made directly to RBC, as

confirmed by a payment confirmation from Northern Trust to RBC."  (*Id.* at ¶16a).  Further,

Tracy Burton, the controller for RFI and RBC, stated in her deposition that "loans for Doge &

Talcott were deposited into RBC, booked as RBC obligations, and never reclassified as external

liabilities."  (*Id.* at ¶ 16b).  Doge further points to the "[t]ax return filed by the Trustee and

prepared by [BDO USA, P.C.], confirming that Doge and Talcott Loans were treated as

obligations of RBC as of December 31, 2019."  (*Id.* at ¶ 16c).  Also, Doge claims that "[a]n

[accounts payable] listing shows a Doge payable of $2,500."  (*Id.* at ¶ 16d).  Lastly, Doge states

in support of its claim that an "excerpt from the general ledger shows Doge and Talcott Loans

were received and booked on RBC's books on February 5, 2018, with no reclassification entries

made to move [them] out of RBC through March 9, 2020."  (*Id.* at ¶ 16e).

The only evidence in support of Talcott's $119,312.36 claim is a statement signed by

Randall Talcott stating that, "as per the 2018 Agreement, Doge Capital[18] advanced Richardson

---

[17] The Court evaluates the evidence in support of Movants' claims as a threshold matter even though not raised by
the Trustee.  The Trustee argues that the Movants' tardy claims are improper because they do not meet the standard
for "contingent claims" and, within that context, do not evidence a relationship between the Movants and RBC
(Opposition, p. 10).  The Movants argue that their tardy claims are not "contingent," but even if they were they
would meet the standard for contingent claims.  (Reply, ¶ 13).  Thus, this Court will first consider whether the tardy
claims (RBC POC Nos. 27-1, 28-1, 29-1) are insufficient on their face as a threshold matter before turning to the
argument that they are also insufficient as "contingent."

[18] This appears to be an error in the Talcott Statement. The 2018 Agreement shows that RFI entered into an
agreement with Talcott for $100,000, while the Doge Loan was $900,000. *See* Memorandum and Opinion, pp. 5-6.

$100,000" (the **Talcott Statement**).  (RBC POC No. 29-1).  Talcott asserts that "as the documentation supporting this Claim is voluminous, Creditor will file a claim supplement in advance of any hearing as to the allowance of this Claim."  (*Id.* at ¶ 17).  In support of its $6,002,915.32 claim, Prairie submitted a statement signed by Michael Barry (the "**Prairie Statement**").  (RBC POC No. 28-1).  The Prairie Statement states that, "as the documentation supporting this Claim is voluminous, Creditor will file a [c]laim [s]upplement in advance of any hearing as to the allowance of this Claim."  (*Id.* at ¶ 6).

Movants further assert in their Reply that they had a "relationship pre-petition because of the Doge/Talcott Loan and Prairie's subrogation rights under Amendment No. 9."  (Reply, ¶ 15).  They also claim that the "accounting records also show that the $1 million proceeds from the Doge/Talcott Loans were sent to RBC, spent by RBC and booked by RBC as a liability of RBC."  (*Id.*).

Privity is a legal relationship between parties to an agreement that arises from rights and obligations.  *Northwell Health, Inc. v. Grp. Hospitalization & Med. Servs., Inc.*, 2024 U.S. Dist. LEXIS 232625, at *6.  A nonsignatory to a loan agreement cannot be bound by the terms of that agreement unless that party assumes the loan.  *See EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) ("It goes without saying that a contract cannot bind a nonparty.").  In construction of contracts, courts have held that privity exists where parties are signatories to the contract.  *See Harte v. Ocwen Fin. Corp.*, 2014 U.S. Dist. LEXIS 132611, at *15 (E.D.N.Y. September 19, 2014) (finding no breach of contract where there was no privity of contract between parties and one party was a nonsignatory to the contract).

In support of the Trustee's argument that the Movants do not hold contingent claims, the Trustee asserts that "the Movants did not have any contact or relationship with RBC" and that

21

"there was no *contractual privity* between the Movants and RBC where both parties knew

liability could arise." (Opposition, p. 12) (emphasis added).

The Court agrees with the Trustee's assertions for somewhat similar reasons. Here, the

claims do not evidence a relationship between Movants and RBC. In support of the Doge Claim,

the Movants reference exhibits to the Substantive Consolidation Motion to establish RBC's

obligation to Doge. (*See* RBC POC No. 27-1); (*see also* RFI Docket No. 97). The Movants

offer a bank statement showing a wire transfer from Doge to RBC in support of their

relationship. (RBC POC No. 27-1, ¶ 16a). The Movants also have submitted a general ledger

that shows the Doge and Talcott Loans were on RBC's books. (*Id.* at ¶ 16e).[19] The contract for

the $900,000, however, is between Doge and RFI only. (RFI Docket No. 113-10). The

$100,000 loan supporting Talcott's Claim was only executed between RFI and Talcott. (*Id.* at

12-20). In fact, in the Motion to Dismiss, it is asserted that the 2018 Agreement creating the

Doge Loan and the Talcott Loan for $900,000 and $100,000, respectively, was executed with

"RFI." (RFI Docket No. 113-10, at ¶ 11).[20] Moreover, this Court has already determined that

the "Doge Loan [and Talcott Loan] merely establish[] that Doge [and Talcott are] a creditor or

party in interest as to RFI, not RBC." (Opinion, p. 17).[21] Therefore, the Movants' claims only

establish, at best, that RBC may have benefitted from the proceeds of the Movants' loans, but

that RBC is not contractually obligated under these loans. (*See* RBC POC Nos. 27-29). Movants

cannot create standing from agreements that they were not party to. *See Premium Mtge. Corp. v.*

---

[19] As set forth above, the evidence in support of the Doge Claim was filed in support of the Motion for Substantive Consolidation. (RFI Docket No. 97, Exhibits 2, 5).

[20] The 2018 Agreement states that Richardson Foods Inc. "hereby promises unconditionally to pay to Doge Capital, LLC . . . $900,000 . . . [and] to pay to Randall L. Talcott . . . $100,000 . . . ." *See* RFI Docket No. 113-10 at ¶ 11.

[21] In denying the Motion to Dismiss, this Court already addressed how the Doge Loan merely establishes that Doge is a creditor or party in interest as to RFI, not RBC. (RFI Docket No. 113-10 at 2-11). Additionally, Doge is not a party to the Subrogation Agreements or the Pledge Agreement, and even if it were, those agreements do not establish Doge's standing in the RBC case.

22

*Equifax Info. Servs., LLC*, 583 F.3d 103, 108 (2d Cir. 2009) (finding that a nonparty cannot use a

contract for standing unless explicit terms allow the non-party to enforce the contract).

Moreover, while the Movants affirm, in support of the Doge Claim, that the Doge and

Talcott Loans were deposited into RBC accounts, this does not make RBC liable on the loans.

(*See* RBC POC No. 27-1, at ¶ 16b); *see also Harte v. Ocwen Fin. Corp.*, 2014 U.S. Dist. LEXIS

132611, at *16 (contractual privity is between signatories and parties to the contract).

As to Prairie's standing, the Movants assert that Prairie's subrogation rights under

Amendment No. 9 to the Webster Loan (the "**Webster Loan Amendment**") provides evidence

in support of Prairie's standing as a creditor in the RBC Case. (Reply, ¶ 15). However, the

Webster Loan Amendment was executed to add Prairie as having the "right of first refusal."

(Motion, Exhibit 4). This does not mean that RBC is in privity with Prairie. To the extent

Prairie's subrogation is relevant, this Court has already addressed how Prairie's subrogation

rights under The First Amended Subrogation Agreement as of August 23, 2019 do not establish

its standing in the RBC bankruptcy case. (*See* Memorandum Opinion and Order, pp. 18-19). [22]

## ii.    The Movants Do Not Hold a Contingent Claim.

The Trustee asserts that each of the tardy claims filed by the Movants (RBC POC Nos.

271-, 28-1, 29-1) are to be evaluated as a "contingent claim." (Opposition, p. 10). The Trustee

posits that a "contingent claim under the Code refers to obligations that will become due upon

---

[22] In the Memorandum Opinion and Order, the Court held:
> As set forth above, the First Amended Subrogation Agreement describes the Prairie Loan as a $280,000 deposit into a bank account maintained at Webster to be held by Webster as collateral security for the Webster Loan. (RFI Docket No. 126-10 at 2–3). Critically, no provision of the First Amended Subrogation Agreement (or for that matter, the Second Amended Subrogation Agreement) explains why Prairie made the Prairie Loan, on behalf of whom Prairie made the Prairie Loan, which Webster bank account the Prairie Loan was deposited in, or the terms governing the Prairie Loan. Rather, the Second Amended Subrogation Agreement states that Prairie, as Pledgor, pledged, assigned, and transferred, for the benefit of Webster, a security interest in the cash comprising the Prairie Loan. (*Id.* at 12). It also states that the Prairie Loan is security for the prompt payment of the Webster Loan. (*Id.* at 13). The Court therefore finds that the Subrogation Agreements do not establish a creditor relationship between Prairie and RBC.

(Memorandum Opinion and Order, pp. 18-19).

the happening of a future event that was within the actual or presumed contemplation of the parties at the time [] the *original relationship between the parties [was]* created." (*Id.*) (emphasis added). The Trustee argues that "the Movants attempt to make the argument that RBC is an alter ego of RFI, thus, they have the right to file a claim against RBC" based on their "contingency" that this Court grants the Motion for Substantive Consolidation. (*Id.*). The Trustee further argues that the tardy claims should therefore be evaluated under the "relationship test" standard in order to determine whether the claims are "contingent." (*Id.*). The Second Circuit applies the "prepetition relationship test" in evaluating whether a contingent claim exists. *See In re Motors Liquidation Co.*, 598 B.R. 744, 755 (Bankr. S.D.N.Y. 2019). Under this test, a contingent claim exists when "(1) the conduct giving rise to the claim occurred prepetition; and (2) there is some minimum 'contact' or 'relationship' between the parties such that the creditor's rights do not 'depend entirely on the fortuity of future occurrences.'" *Id.* (citing *In re Motors Liquidation Co.*, 829 F.3d 135, 156 (2d Cir. 2016)). To establish the second requirement, a party must show "events occurring before confirmation [that] create a relationship, such as contact, exposure, impact, or privity, between the claimant and the debtor." *Id.* at 756. The Trustee argues that the Movants fail the relationship test because: 1) there was no "conduct" between RBC and the Movants that would give rise to a contract claim; and 2) the Movants do not have any "minimum contact or relationship" with RBC to establish that the Movants are creditors of RBC. (Opposition, pp. 11-12). Namely, the Trustee posits that there was no "conduct" between RBC and the Movants because as a subsidiary of RFI, RBC would not have been the primary entity involved in the dealings with the Movants. (Opposition, p. 11). Also, there is no prepetition relationship between RBC and Movants as Movants did not have any contact with RBC until they were named in the Adversary Proceeding. (*Id.*).

24

In the Reply, the Movants argue that the Movants' claims are not contingent, but if they were, they would pass the "relationship test." [23] (Reply, ¶ 7). Movants assert that their "relationship" is evidenced by the Doge and Talcott Loans that were deposited into RBC's accounts and Prairie's subrogation rights in the Webster Loan Amendment. (*Id.* at ¶ 15).

First, the Court agrees with the Trustee that the Movants have not established that there was any prepetition conduct. While the Movants assert that they have a prepetition "relationship" with RBC, that relationship does not bind RBC under, for instance, the terms of a loan as RFI is bound. (Reply, ¶ 7). Unlike in the *In re Motors* case, the Movants and RFI do not have a sufficient prepetition relationship. *See In re Motors*, 598 B.R. at 756 (finding that the relationship between the parties was "firmly rooted" in the parties' contractual relationship). A "claim cannot be extended to include . . . claimants . . . whose rights depended entirely on the fortuity of future occurrences." *See In re Motors Liquidation Co.*, 829 F.3d at 135 (internal citations omitted).

As set forth *supra*, section (IV)(A)(3)(a), the evidence in support of Movants' claims only demonstrates the proceeds of the loan were deposited in an account maintained by RBC, but the evidence does not establish that RBC was in privity with the Movants.

Second, the Court agrees with the Trustee that the Movants have also failed to establish some "minimum contact or relationship." To satisfy this element, there must exist some relationship between the parties. Indeed, contingent claims are triggered by the occurrence of a specific event contractually tying a debtor to a creditor. *See In re Motors Liquidation Co.*, 598 B.R. at 754 (a contingent claim must result from prepetition conduct that gives rise to that

---

[23] The Movants did not deem their claim to be "contingent" and did not analyze the claim under the "relationship test" in the Motion to Reconsider. (*See* Motion p. 4). After the Trustee raised the argument in the Opposition, the Movants evaluated their claims under the "contingent claim" standard in the Reply. (*See* Reply, ¶¶ 14, 15).

claim).  However, this presumes there exists some relationship between the Debtor and Movants.

In this case, Doge and Talcott never entered into a contractual relationship with RBC.  *Compare

with In re Motors Liquidation Co.*, 598 B.R. at 756 (finding that the creditor's contingent claim

arose out of a legal relationship through an agreement that existed prepetition between the debtor

and creditor).  The evidence in RBC POC No. 27-1 (which also references the Talcott Loan)

does not establish that the Movants have a contingent claim against RBC.  (*Id.*); (*see also* RFI

Docket No. 97, Exhibit 2, 5 (exhibits attached to the *Motion for Substantive Consolidation* do not

establish a loan agreement between RBC and Doge/Talcott).  As for Prairie, there was no

prepetition contract that created a relationship between RBC and Prairie that would establish

liability.  (RFI Doc No. 126-10 at 2-3, 11-18).  As this Court previously held in the *Opinion*, the

Subrogation Agreements do not "explain why Prairie made the Prairie Loan, on behalf of whom

Prairie made the Prairie Loan, which Webster bank account the Prairie Loan was deposited in, or

the terms governing the Prairie Loan."  (Memorandum Opinion and Order, p. 18).  The purpose

of the Subrogation Agreements was not to contractually bind RBC, but to offer additional

security for the Webster Loan.[24]

As detailed above, the Movants' claims simply repackage existing evidence and

information as "new evidence" to support their standing as creditors in the RBC Case.  (*See* RBC

Case, Claims Register).  The "new evidence," however, falls short of establishing a creditor-

debtor relationship between the RBC and Movants.

---

[24] It should also be noted that upon the satisfaction of the Webster Loan from the Roses UCC Sale and Prairie's
payout from the sale, the terms of the Subrogation Agreements would terminate with respect to RFI's and RBC's
liability.  (RFI Docket No. 113-12).

Since this Court previously determined that the Movants do not have standing as creditors in the case and Movants have failed to establish that reconsideration pursuant to Federal Rule 60(b) is warranted, the Movants cannot establish standing.

### 2. ***Kaiser Gypsum* and Section 1109 Are Not Sufficient for Reconsideration.**

#### a. **Section 1109 Only Applies to Chapter 11 Cases.**

In the Motion, the Movants cite to 11 U.S.C. § 1109(b) to establish their standing as "parties in interest." (Motion, ¶ 11). The Movants cite to caselaw to argue that "the right for a party in interest to be heard in a bankruptcy proceeding, as set out in Chapter 11, also applies in a Chapter 7 case." (Reply, ¶ 3) (internal citations omitted).

In the Opposition, the Trustee states that "[the Movants now] seek to make the new argument that under Rule 3002(a) of the Federal Rules of Bankruptcy Procedure and 11 U.S.C. § 1109 of the Bankruptcy Code, they are entitled to standing after filing a proof of claim against RBC." (Opposition, p. 9).

The Bankruptcy Code does not define "party in interest," but "the phrase has generally been interpreted in a Chapter 7 case to refer to creditors of the debtor who have claims against the estate and whose pecuniary interests are directly affected by the bankruptcy proceedings. *See In re Richardson Foods, Inc.*, 659 B.R. 154, 164 (Bankr. S.D.N.Y. 2024) (quoting *In re Slack*, 164 B.R. 19, 22 (Bankr. N.D.N.Y. 1994)). "Whether or not someone is a party in interest must be read against the purposes of Chapter 11, which are to 'preserv[e] going concerns and maximiz[e] property available to satisfy creditors.'" *See In re Teligent*, 640 F.3d 53, 61 (2d Cir. 2011). The Movants are incorrect in their assertion that Section 1109 applies to Chapter 7 cases. (Reply, ¶ 3). Section 1109 states that "a party in interest, including . . . a creditor . . . may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. 1109(b). This "chapter" refers to Chapter 11. Section 1109 of the Bankruptcy Code is limited to cases

27

under Chapter 11.  *See In re Fiber Optek Interconnect Corp.*, 2010 Bankr. LEXIS 5007, at * 14

("[T]he Bankruptcy Code itself limits the provisions of Bankruptcy Code

§ 1109(b) to cases under chapter 11.").  As noted in the *In re Fiber Optek* case, Section 103(g)

distinctly states that, "subchapters I, II, and II of chapter 11 apply only to cases under

chapter 11." *Id.*; *see also* 11 U.S.C. § 103(g) (Bankruptcy Code § 1109 is within subchapter I of

chapter 11).  Furthermore, in chapter 7 or liquidation cases, some courts have declined to apply

Section 1109.  *See In re Interregional Equity Corp.*, 218 B.R. 731, 736, 740 (determining that

Section 1109 only applies to cases under Chapter 9 and Chapter 11 of the Bankruptcy Code, and

declining to rely on Section 1109 for the liquidation proceeding); *see also In re Whitman-Nieves*,

519 B.R. 1, 7 (Bankr. D.P.R. 2014) ("The court denies the Plaintiffs' argument under 11 U.S.C.

§ 1109, for it is only applicable to Chapter 11 cases, not Chapter 7 like the instant one.").

Indeed, the RBC Case was filed under Chapter 7 of the Bankruptcy Code.  (*See* RBC Docket No.

1, Petition).  Section 1109, thus, is not applicable.  Moreover, even if the Movants could prevail

in arguing that Section 1109(b) applies in this context, the Movants would still not qualify as

"parties in interest."  As set forth above, while "party in interest" is not defined in the

Bankruptcy Code, it has generally been interpreted in Chapter 7 cases to refer to creditors "who

have claims against the estate and whose pecuniary interests are directly affected by the

bankruptcy proceedings."  *See In re Manshul Constr. Corp.*, 223 B.R. 428, 429 (Bankr. S.D.N.Y.

1998) (quoting *In re Slack*, 164 B.R. 19, 22 (Bankr. N.D.N.Y. 1994)).  As discussed, *supra*

section (IV)(B)(3), this Court has already rejected the Movants' argument that they possess a

pecuniary interest in the RBC Case.  The Movants' reliance on the Doge and Talcott Loans and

the Prairie Subrogation Agreements only establishes a pecuniary interest with RFI.  The Movants

have not presented any new evidence in attempting to establish an alleged pecuniary interest in RBC.  (Motion, ¶ 14).

### b. The Supreme Court Case, *Kaiser Gypsum*, Is Not Determinative in Chapter 7 Cases And Accordingly Does Not Alter This Court's Original Decision.

The Court gave Movants' leave to file the Reply to address the Supreme Court decision in *Kaiser Gypsum*. [25]  In their Reply, the Movants assert that "[a]s the Supreme Court recently held, standing in bankruptcy cases is broad, and even contingent claims have standing."  (Reply, ¶ 3).  The Movants further argue that "[p]ursuant to 11 U.S.C. [Section] 1109, any party in interest . . . may raise and may appear and be heard on any issue."  (Reply, ¶ 6) (citing *Kaiser Gypsum Co.*, 602 U.S. at 271) (internal quotations omitted).

The Trustee in its Sur-Reply addressed the Movants' reliance on *Kaiser Gypsum*.  (Sur-Reply, ¶ 4).  The Trustee asserts that *Kaiser Gypsum* does not apply in this case, as "[t]he Court made clear throughout the opinion that Section 1109 only pertained to Chapter 11 reorganization proceedings."  (*Id.*).  The Trustee argues that the Supreme Court found that Section 1109 only applies to the "unique circumstances and goals of Chapter 11 reorganizations . . . ."  (*Id.* at 5, 6).  The Trustee argues, as in the *Opposition*, that the Movants' claims do not meet the "prepetition relationship test" and therefore do not establish standing.  (*Id.* at 7).  The Trustee continues to argue that the Movants do not have any "skin in the game" and therefore have no interest in the RBC bankruptcy proceeding.  (*Id.* at ¶ 8).

The arguments will be considered under FRCP Rule 60(b), which permits relief from judgment for "any other reason that justifies relief," and the potential "change in intervening controlling law" applied by courts pursuant to FRCP Rule 59(e).  *See In re Cal. Dump Truck*

---

[25] The *Kaiser Gypsum* case was decided by the Supreme Court on June 6, 2024, after the instant Motion was filed on May 3, 2024.  (RFI Docket No. 140-1).

*Owners Ass'n v. Davis*, 302 F. Supp. 2d 1139, 1141 (E.D. Ca. 2002) (parties can argue a change in the controlling law pursuant to Rule 60(b)(6) which permits relief from final judgment for "any other reason that justifies relief"); *see also Kennedy v. Jefferson Cnty. Hosp.*, 2016 U.S. Dist. LEXIS 151875, at *4 (S.D. Miss. November 2, 2016) (change in intervening controlling law for purposes of Rule 59(e) refers to binding precedent only).

In *Kaiser Gypsum*, the Petitioner, Truck Insurance Exchange, was the primary insurer for two Chapter 11 debtors – Kaiser Gypsum Co. and Hanson Permanente Cement. *Kaiser Gypsum*, 602 U.S. at 274. Truck Insurance Exchange sought to oppose the Chapter 11 plan under Section 1109 of the Bankruptcy Code. *Id.* at 275-76. The bankruptcy court held, and the Fourth Circuit affirmed, that the plan at issue was insurance neutral and therefore Truck Insurance Exchange was not a party in interest under Section 1109 of the Bankruptcy Code. *Id.* at 276-77. The Supreme Court reversed and held that Truck Insurance Exchange was in fact a "party in interest" and found that an insurer with financial responsibility for bankruptcy claims can be directly or adversely affected by the reorganization process. *Id.* at 281. The Supreme Court held that "anyone holding a direct financial stake in the outcome of the case," thus, expanding the definition of "party in interest" in Chapter 11 Cases. *Id.* at 277-78.

This Court agrees with the Trustee that the broadened definition of "party in interest" narrowly applies to Chapter 11 – not Chapter 7 – cases. (*See* Sur-Reply, ¶¶ 5, 6). The Supreme Court acknowledged that the expansive definition of "party in interest" under Chapter 11 is meant to enable minority creditors to intervene in Chapter 11 cases to prevent "dominant interests" from "controlling the restructuring process." *See Kaiser Gypsum*, 602 U.S. at 281. This concern is not as prevalent in Chapter 7. [26] The same interests relevant to protecting

---

[26] Here, the chapter 7 trustee, in her independent capacity, filed the RBC case to investigate and recover potential fraudulent conveyances from the Roses UCC Sale for the benefit of the estate. (*See* Memorandum Opinion and

creditors in a Chapter 11 reorganization do not exist in Chapter 7 where a trustee is appointed to oversee the case. *See In re Wolfson*, 586 B.R. 790, 794 (Bankr. D. Co. 2018) ("In a chapter 7 case, a chapter 7 trustee is appointed to protect the interests of creditors and the estate, and to balance those interests against those of the debtor."). The Court concurs with the Trustee the demands of "active participation" by all parties in a Chapter 11 case do not exist in a Chapter 7 case where the trustee is tasked with liquidating assets for the benefit of all parties. *See In re Babayoff*, 445 B.R. 64, 82 (Bankr. E.D.N.Y. 2011) ("[A] trustee's ability to examine the estate as an independent fiduciary and administer it in an orderly fashion protects creditors, just as 'the benefits of bankruptcy protection' benefitted the debtor [in a Chapter 11 case]." (internal citations omitted)). Section 1109 is applicable under Chapter 11 due to the complexities of a reorganization that demand all creditors with a financial stake be represented appropriately, compared to a Chapter 7 case where the estate is administered by an independent trustee. *See In re Wolfson*, 586 B.R. at 794 (discussing chapter 11 debtor-in-possession underlying conflicts of interest with creditors).

The Court finds that even if *Kaiser Gypsum* applied to the RBC Case, the Movants are not "parties in interest." Movants do not hold "a direct financial stake in the outcome of the case," as distinguished from the insurer in *Kaiser Gypsum* who held direct financial responsibility for claims. *Kaiser Gypsum*, 602 U.S. at 284; (*see also* RBC POC Nos. 27-1, 29-1) (claims do not establish that Doge, Talcott or Prairie have a direct financial stake in the RBC case). The insurer in *Kaiser Gypsum* had a financial interest in the Chapter 11 case because the insurer was primarily responsible for indemnifying claims. *Kaiser Gypsum*, 602 U.S. at 284.

---

Order, p. 10). The Movants are not being negatively impacted in the RBC Case. In fact, Doge, Talcott and Prairie were the only parties who did not settle in the Adversary Proceeding. (*Id.* at p. 11).

Here, in addition to the fact that this is a Chapter 7 case, the Movants are not financially liable for or impacted by the RBC Case.[27]

The *Kaiser Gypsum* case does not warrant reconsideration of the Court's ruling on the Motion to Dismiss. Reconsideration is only appropriate when "the court has overlooked controlling decisions that, had they been considered, might have reasonably altered the result." *See Kuritz v. New York*, 2013 U.S. Dist. LEXIS 95204, at *9 (N.D.N.Y. July 16, 2013) (citing *Cobalt Multifamily Investors I, LLC v. Shapiro*, 2009 WL 4408207, at *2 (S.D.N.Y. 2009)); *see also In re Biovail Corp. Sec. Litig.*, 247 F.R.D. 71, 72 (S.D.N.Y. 2007) (denying motion to reconsider because movants did not persuade the court that it had overlooked controlling legal authority that would alter the outcome of the case). This Court has determined that *Kaiser Gypsum* would not have reasonably altered the Court's Memorandum Opinion and Order because: 1) Section 1109 does not apply to the Chapter 7 RBC case; and 2) Movants are not "parties in interest."

## C.    RECONSIDERATION OF THE FACTS AND EVIDENCE IN SUPPORT OF THE MOTION TO DISMISS DOES NOT JUSTIFY RELIEF

### 1.    The Motion for Reconsideration Is Not a Vehicle to Relitigate Issues And Facts Previously Raised.

It appears that the catch-all provision of FRCP Rule 60(b)(6) applies to the arguments made by the Movants urging this Court to reconsider its ruling that dismissal is not warranted

---

[27] The Court has already determined that the Movants do not have a financial stake in the case. In the *Memorandum Opinion and Order*, this Court cited to *In re Gucci*, which is consistent with *Kaiser Gypsum*. In *Kaiser Gypsum*, the Court held that the "§ 1109(b) inquiry asks whether the reorganization proceedings might affect a prospective party." *In re Gucci* states that "in determining whether a creditor has standing to seek a dismissal, the court should consider whether the party raising the challenge has a stake in the case sufficient to entitle it to be heard." *See In re Gucci*, 174 B.R. 401, 412 (Bankr. S.D.N.Y. 1994); (*see also* Memorandum Opinion and Order, p. 22). Based on *In re Gucci*, in part, this Court determined that the Movants do not have a sufficient stake in the proceedings to support their standing. (Memorandum Opinion and Order, p. 22).

because the RBC Petition was an authorized filing by the Trustee.[28]  (*See* Memorandum Opinion

and Order, pp. 20-29); *see also In re Enron Corp.*, 352 B.R. at 369.  As set forth above, FRCP

Rule 60(b)(6) permits relief from final judgment for "any other reason that justifies relief."

Relief is only appropriate under Rule 60(b)(6) "in cases presenting extraordinary circumstances"

or where the judgment may work an "extreme and undue hardship."  *See Rodriguez v.

Mitchell,* 252 F.3d 191, 201 (2d Cir. 2001) (internal citations omitted); *see also In re Teligent,

Inc.*, 326 B.R. 219, 227 (S.D.N.Y. 2005) (movant failed to demonstrate any "extraordinary

circumstance" or that "extreme and undue hardship" exists to satisfy Rule 60(b)(6)).  In

determining whether a movant has met its burden under Rule 60(b)(6), relevant considerations

include: (1) the desire to resolve disputes on their merits; (2) the existence of a meritorious claim

or defense; and (3) the absence of unfair prejudice to the opposing party if the requested relief is

granted.  *See In re Teligent, Inc.*, 326 B.R. at 227 (citing *Rupert v. Krautheimer,* 210 B.R. 37, 44

(Bankr. S.D.N.Y. 1997)).

Under Bankruptcy Rule 9024, the only standard that might apply to the arguments made

here would be: the "need to correct a clear error or prevent manifest injustice."  *In re Flatbush

Square Inc.*, 508 B.R. 563 at 569.  However, courts have held that under this standard, relief is

"appropriate only when a court overlooks 'controlling decisions or factual matters that were put

before it on the underlying motion' and which, if examined, might reasonably have led to a

different result."  *See Corrines v. Am. Physicians Ins. Trust*, 769 F. Supp. 2d 584, 593 (S.D.N.Y.

2011) (internal citations omitted).

Here, the Movants have not met the standard under Bankruptcy Rule 9023 nor 9024.  The

Movants are rearguing their original Motion to Dismiss – failing to offer any reasonable

---

[28] The Movants did not specifically seek relief pursuant to Rule 60(b)(6), but it appears to be the only subsection that
applies to the arguments made by Movants.  Subsections (1)—(5) do not appear to apply to these facts.

justification to reconsider the Court's decision. (Motion, pp. 7-13). The Movants assert that the Court "should reconsider its Order" denying dismissal. (*Id.*). While the catch-all provision of Rule 60(b)(6) is a "grand reservoir of equitable power . . . that reservoir is not bottomless." *See United States v. Meiri*, 2024 U.S. Dist. LEXIS 188742, at *7 (S.D.N.Y. October 17, 2024) (internal citations omitted). As discussed further below, upon reexamination of the facts and evidence put before this Court in the Motion to Dismiss, and even the new arguments made in the Motion, the Court is not led to a different result. *See In re Flatbush Square, Inc.*, 508 B.R. at 571 (denying motion to reconsider because no new facts or evidence were presented and upon examination of the evidence, the court determined there was cause to lift the stay). The Movants rehash their argument that the Trustee lacked authority to file the RBC case because: 1) the filing was not properly authorized by the Board and 2) the Trustee could not vote the RBC Share as the Pledge Agreement had not been terminated. (Motion, ¶¶ 19, 27). The Movants put forth a new argument in the Motion that the Pledge Agreement was amended by the Subrogation Agreement.[29] This new argument, however, does not "reasonably" lead this Court to a different result. *See Corrines*, 769 F. Supp. 2d at 593 (S.D.N.Y. 2011). The Court has already evaluated all the evidence in the case and concluded that dismissal is not warranted. (*See* Memorandum Opinion and Order, pp. 20-29). The Movants have also failed to carry their burden of proof in establishing that the extraordinary relief sought in reconsideration is warranted. *See In re Celsius Network LLC*, 2024 Bankr. LEXIS 2552, at * 6-7 (denying motion for reconsideration because the renewed arguments did not meet the standard under Fed. R. Civ. P. 60(b)). In any event, this Court will evaluate the Movants' and Trustee's arguments in turn.

---

[29] The Court determined, in the Memorandum Opinion and Order, that: "[t]he Subrogation Agreement does not change this result because Prairie was not an original party to the Pledge Agreement and did not seek an amendment to the Pledge Agreement in order to obtain the rights thereunder. (RFI Docket No. 126-10[,] at 3 (Section 8 of the Second Amended Subrogation Agreement))." (Memorandum Opinion and Order, pp. 27-28).

**2.  The Trustee Had Authority To File The RBC Case Because The Board
Could Implicitly Ratify**

The Movants urge the Court to reconsider "its Order because the RFI Board could not

(and did not) ratify the unauthorized RBC bankruptcy filing through inaction." (Motion, ¶ 16).

The Movants argue that the bankruptcy filing "was not a 'company action' but instead an ill-

conceived act of a third party that had no authority to act."  (*Id.* at ¶ 19).  They argue that the

Board had resigned and, in any event, "without an affirmative vote or action, the Board could not

ratify the bankruptcy filing under Florida law – mere inaction is not enough."  (*Id.* at ¶ 20).

The Trustee first asserts that the Movants do not have the right to challenge the

bankruptcy filing as unauthorized.  (Opposition, p. 12).  The Trustee then argues that the

Movants have not presented any new "facts or case law the Court may have overlooked" in

determining that the Board of Directors had authority to implicitly ratify the filing.  (*Id.* at p. 13).

The Trustee also argues that the Board of Directors could implicitly ratify because when the

RBC Petition was filed, the Board was still compromised of Teeger, Haber and Afek.  (*Id.*).  The

Trustee argues that their actions implicitly ratified the filing of the Petition by the Trustee.  (*Id.*).

In the Reply, the Movants respond to the Trustee's arguments that the Movants do not

have standing to challenge ratification.[30]  (Reply, ¶ 16).  The Movants assert that they have

standing as secured creditors in the case.  (*Id.* at ¶ 17).  The Movants then assert that the "Board

of Directors did not implicitly ratify anything."  (*Id.* at ¶ 18) (emphasis added).  The Movants

cite to *Price v. Gurney*, 324 U.S. 100, 106 (1945), in support of their argument for dismissal.

(*Id.*).  They assert that the "Board of Directors could not have accidentally ratified the petition."

(*Id.*).  The Movants further stress that "the Trustee's argument that inaction somehow implicitly

---

[30] Although not originally raised in the Motion, the Movants responded to the Trustee's assertions (and indirectly
challenged this Court's ruling) that they have standing to challenge the authorization of the RBC filing.  (*See*
Opposition, p. 12); (*see also* Reply, ¶¶ 16, 17).

ratifies a bankruptcy petition, makes a mockery out of the Florida Corporate Law." (*Id.* at ¶ 19). The Movants conclude by stating that the Board did not ratify nor approve the RBC Petition and therefore the RBC case should be dismissed. (*Id.*).

Preliminarily, as set forth *supra*, section (IV)(B)(1)-(5), the Movants do not have standing as creditors and therefore cannot challenge the Trustee's authority to file the RBC Case.

Furthermore, this Court agrees with the Trustee that the Court has already determined that the Board could implicitly ratify the actions of the Trustee retroactively. (Reply, p. 13); (*see also* Memorandum Opinion and Order, pp. 24-25). Florida law permits subsequent ratification, even if originally unauthorized, "and such ratification relates back and supplies original authority." *See In re Mojo Brands Media LLC*, 2016 Bankr. LEXIS 829, at * 6 (Bankr. M.D. Fla. March 16, 2016) (citing *Banyan Corp. v. Schucklat Realty, Inc.*, 611 So. 2d 1281, 1282 (Fla. Dist. Ct. App. 1992)).

The Movants argue that if there was not an "affirmative vote or action," the Trustee did not have authorization to file the RBC Petition. (Motion ¶ 20); (*see also* Reply, ¶ 18). However, what the Movants deem as "inaction" by the Board is implicit authorization. (Reply, ¶ 19). For authorization by ratification, "either action or inaction may be evidence of ratification." *See In re Reliable Air, Inc.*, 2007 Bankr. LEXIS 3060, at *11 (Bankr. N.D. Ga. March 9, 2007).

The Board, who, by the Movant's own admissions, had not resigned, implicitly ratified the Trustee's filing of the RBC case through their actions.[31] (RFI Docket No. 123-1). Afek,

---

[31] In the Memorandum Opinion and Order, the Court already determined that Teeger, Haber, and Afek could implicitly ratify the RBC filing as they had not resigned prior to 2021. The Court noted that:

> [I]n the Teeger in the Teeger affidavit, Teeger states that "[i]mmediately following the sale to Roses which was approved by the [RBC] Board, RBC ceased all operations and as a result, the board ceased to function, and the board members effectively resigned." (RFI Docket No. 123-1 at ¶ 4). However, RBC's bylaws state that "[a] director may resign at any time by delivering written notice to the board of directors or its chairman or to the corporation. A resignation is effective when the notice is delivered unless the notice specifies a later effective date." (RFI Docket No. 113-7 at Art. 3 § 11). No party produced any written notice indicating that the RBC Board properly resigned pursuant to the RBC Bylaws. Indeed, at the

36

specifically, was designated as the authorized representative of RBC and had signed RBC's schedules. (RFI Docket No. 63); (*see also* RBC Docket No. 19). The Board had undertaken a plethora of actions involving the RBC case that, when taken together, demonstrate the Trustee had implicit authorization to file the RBC case. (Memorandum Opinion and Order, p. 25); *see also In re Reliable Air, Inc.*, 2007 Bankr. LEXIS 3060, at *12 (shareholder's active participation, over the 11 months between the filing and the motion to dismiss, in the bankruptcy case reflects the shareholder's implicit ratification of the bankruptcy filing).

In addition, the Court found that the Board did not "accidentally" ratify the RBC Petition – it was an *after-the-fact* ratification that was implied by the actions of the Board of Directors – a distinction that the Movants appear to ignore. (Memorandum Opinion and Order, pp. 25-26); *see also In re Mojo*, 2016 Bankr. LEXIS 829, at *6 ("[W]ith respect to unauthorized corporate bankruptcy filings, lower courts within the Eleventh Circuit have permitted ratification of such filings after the fact.").

Furthermore, the Movants erroneously rely on *Price* to support their argument that unauthorized petitions filed under the Bankruptcy Code must be dismissed. (Motion, ¶ 17); (Reply, ¶ 18). This Court has already found that *Price* "did not address whether the required authorization under local law could be found in ratification/relation back doctrine."[32]

---

Hearing in this matter, the Movants themselves argued that the board had not effectively resigned and therefore Teeger, Haber, and Afek remain members of the board. (See Hearing Transcript 81:13–82:3 (asserting that the Teeger affidavit is "an admission that the board members did not resign. . . . [T]hat's not how boards work. . . . The trustee should have contacted the board, and perhaps the trustee did. We do not know. . . . Those board members thought that they had effectively resigned . . . [b]ut they had not resigned.")). As no other purported board members have been identified, it appears that Teeger, Afek, and Haber were still RBC Board members as of March 8, 2021, when the RBC petition was filed. (Memorandum Opinion and Order, pp. 25-26 n. 14).

[32] The Court determined, in part, that:

Here, RBC is a Florida corporation, and resolution of this issue is therefore governed by Florida law. (Docket No. 113-7, Art. 12 (stating that the bylaws are to be construed under Florida law)). Under Florida law, "[a] principal can ratify the unauthorized act of an agent purportedly done on behalf of the principal either expressly or by implication through conduct that is inconsistent with an intention to repudiate the

(Memorandum Opinion and Order, p. 23); *see also Hager v. Gibson*, 108 F.3d 35, 39 (4th Cir.

1997) (*Price* does not "foreclose that possibility"). As determined by the Court, "Teeger, Haber,

and Afek were the parties who had the ability to ratify the Trustee's act of filing the petition at

the time of filing" and in fact did ratify the filing, pursuant to Florida law, through their actions

in the RBC case. (Memorandum Opinion and Order, p. 25). The Movants have not provided

any new information as to their reliance on *Price* to support their proposition that the RBC Case

must be dismissed because it was not filed by a party with authority to do so. (*See* Memorandum

Opinion and Order, p. 23); (*see also* Motion, ¶ 17).

Therefore, the Movants have failed to present any grounds under Bankruptcy Rule 9023

or 9024 that justify reconsideration of this Court's decision that dismissal is not warranted

because the Trustee had authorization to file the RBC bankruptcy case.

### 3.   The Trustee Could Vote Her Share As Previously Determined By This Court.

### a)   The Pledge Agreement Terminated.

The Movants argue that the "Court should reconsider the requirements of termination in

the Pledge Agreement and determine that the Pledge [A]greement did not terminate." (Motion, ¶

24). The Movants assert that the Pledge Agreement did not terminate because: 1) there is no

evidence that the "parties to the [Webster Loan] ever terminated that agreement"; 2) the RBC

stock still vests with Webster; and 3) obligations that should have been paid to trigger the

termination clause of the Pledge Agreement were not paid. (*Id.* at ¶¶ 27-29). Movants then

argue that the Pledge Agreement was amended by the subsequent amendments, including the

---

unauthorized act." *In re Mojo Brands Media*, LLC, No. 6:15-BK-03871-CCJ, 2016 WL 1072508, at *2
(Bankr. M.D. Fla. Mar. 16, 2016) (quoting *McDonald v. Hamilton Elec., Inc. of Florida*, 666 F.2d 509, 514
(11th Cir. 1982)). Likewise, a "principal may subsequently ratify its agent's act, even if originally
unauthorized, and such ratification relates back and supplies original authority." *Id.* (quoting *Banyan Corp.
v. Schucklat Realty, Inc.*, 611 So.2d 1281, 1282 (Fla.Dist.Ct.App.1992)) . . . .

(Memorandum Opinion and Order, p. 24).

Webster Loan Amendment and Subrogation Agreements. (*Id.* at ¶ 32). The Movants state that "agreements and subsequent amendments must be read together" as integrated documents. (*Id.* at ¶ 33). Specifically, they claim that the documents demonstrate that "RFI and RBC both acknowledged the rights of Prairie as a subrogated party under all agreements – necessarily including the Pledge Agreement – and therefore the Court's Order should be reconsidered and corrected." (*Id.* at ¶ 34).

The Trustee opposes the Movants' argument and states that "since the Pledge Agreement and Subrogation Agreements were based on separate consideration . . . they should not be read or incorporated together." (Opposition, p. 14). Applying Second Circuit caselaw, the Trustee posits that for two agreements to be read together, they must have been executed at the same time, by the same parties, for the same purpose and during the same transaction. (*Id.*). The Trustee further asserts that: 1) the Subrogation Agreements and Pledge Agreement were executed five years apart with separate consideration for each agreement; 2) there was a different set of parties who each executed the Pledge Agreement and Subrogation Agreement; and 3) the purpose of the Pledge Agreement and Subrogation Agreements was distinct in that the Subrogation Agreements were executed for Prairie and the Board to pledge additional security for the Webster Loan and the Pledge Agreement was used to assign RBC's Share as security for the Webster Loan. (*Id.* at pp. 14-15). The Trustee also argues that the Pledge Agreement "terminated according to its own terms when Webster was paid in full and that RBC shares were not sold to Roses as party of the [Roses UCC Sale] . . . ." (*Id.* at p. 16).

In its Reply, the Movants respond that the "Pledge Agreement can be read in conjunction with the Subrogation Agreement" as an integrated agreement. (Reply, ¶ 20). This is because the Subrogation Agreements reference collateral and the Pledge Agreement references the Webster

Loan.  (*Id.*).  The Movants again assert that the Subrogation Agreements gave Prairie rights in

the collateral.  (*Id.*).  The Movants also assert that the "Pledge Agreement was not terminated"

because the obligations have not been paid in full.  (*Id.* at ¶ 26).

First, the Court has already decided that the RBC stock, while physically with Webster,

can still be in the possession of the Trustee.[33]  (Memorandum Opinion and Order, p. 28).

Second, the Court in the Memorandum Opinion and Order determined that the Pledge

Agreement was terminated when Webster was paid.  (Memorandum Opinion and Order, p. 27).

The Movants have not offered any new information or evidence to support their argument here –

they only claim that this Court overlooked evidence in support of termination.[34]  (Motion, ¶¶ 27-

31).  The Court reaffirms that the Pledge Agreement terminated, permitting the Trustee to vote

the RBC Share.

The terms of the Pledge Agreement were satisfied when Webster was paid in full

pursuant to the Roses UCC Sale.  (Memorandum Opinion and Order, p. 27); (*see also* RFI

Docket No. 113-13).  The Pledge Agreement states that:

> Promptly following the payment in full of the [obligations under the Webster Loan] and
> the irrevocable termination of the [Webster Loan], [Webster] shall deliver to [RFI] the
> [RBC Share] pledged by [RFI] at the time subject to this [Pledge] Agreement and all
> instruments of assignment executed in connection therewith, free and clear of the liens
> hereof and, except as otherwise provided herein, all of [RFI]'s obligations hereunder shall
> terminate at such time.

---

[33] The Court determined in the Order that:

> [T]he fact that the Trustee is not in physical possession of the RBC Share is no bar to her voting it, and the
> Trustee has not abandoned the RBC Share.  (Opposition at ¶ 44–55).  Section 541(a) of the Bankruptcy
> Code states that property of the estate is comprised of all legal or equitable interests in property wherever
> located and by whomever held.  *See* 11 U.S.C. §§ 541(a)–(a)(1); *see also In re Arcapita Bank B.S.C.(C)*,
> 575 B.R. 229, 250–51 (Bankr. S.D.N.Y. 2017).  Moreover, Section 554(d) of the Bankruptcy Code
> provides that estate property remains property of the estate until it is abandoned, following notice to all
> creditors and a hearing.  *See* 11 U.S.C. § 554(a); *see also In re Residential Capital*, LLC, 523 B.R. 24, 39
> (Bankr. S.D.N.Y. 2014) (*citing Holta v. Zerbetz* (*In re Anchorage Nautical Tours, Inc.*), 145 B.R. 637, 642
> (9th Cir. BAP 1992)).

(Memorandum Opinion and Order, p. 28).

[34] The exhibits that the Movants refer to in support of their argument contain the same information that the Court
reviewed in determining that there was not cause to dismiss the RBC case. (Memorandum Opinion and Order, pp. 4-
9).

(Pledge Agreement § 14).

Pursuant to the terms of the Default Letter, Webster would be paid $2,510,871.66 in

satisfaction of the Webster Loan.  (RFI Docket No. 113-12).  Additionally, upon the Roses UCC

Sale[35], Webster and other parties' claims, totaling $3,402,871.86, would be paid in full and the

RBC Share would not be sold to Roses.  (RFI Docket No. 113-13).  As such, since the Webster

Loan was paid in full pursuant to the Roses UCC Sale, the "express terms of the Pledge

Agreement" state that the RBC Share would have reverted to RFI.  (Memorandum Opinion and

Order, p. 28); (*see also* Pledge Agreement § 14).  And, therefore, the Pledge Agreement

"terminated on its own terms."  (Opposition, p. 16).

The Movants attempt to reargue a point from the Motion to Dismiss (Memorandum

Opinion and Order, p. 27) that since "Prairie and other subrogated parties were not paid in full" –

the Pledge Agreement could not be terminated.  (Motion, ¶ 29).  However, the Pledge Agreement

explicitly states that "payment in full of the [obligations under the Webster Loan]" terminates the

Webster Loan, reverting the RBC Share to RFI.  (Pledge Agreement § 14).  Therefore, "Prairie

and other subrogated parties" cannot have an interest in the RBC Share as Webster's interest

terminated upon satisfaction of the Pledge Agreement.[36]  *See In re Jones*, 534 B.R. 588, 599

(Bankr. D. Vt. 2015) (subrogees cannot have rights "greater than" the rights of the subrogor).  As

such, Prairie and other subrogated parties cannot hold a security interest in the RBC Share

greater than Webster's interest, which terminated upon satisfaction of the Webster Loan.  *Id.*

---

[35] "The Roses UCC Sale provided for a sale that was substantially the same as that contemplated by the Default Letter." (Memorandum Opinion and Order, p. 9).

[36] The Default Letter indicates that the present amount due and owing to parties was $3,402.871.86. (RFI Docket No. 113-12).  While the Trustee does not address this, the Movants argue that the amount distributed to parties, aside from Webster, is deficient by $200,000 because the pledged collateral is $1,092,000.  (Motion, ¶ 29).  This Court, however, notes that this would not diminish the satisfaction of Webster's Loan because the default amount owed to Webster, and other parties, was the value of their loans.  The Default Letter is not a contract with rights greater than the Webster Loan or Pledge Agreement.  (RFI Docket No. 113-12); (Pledge Agreement § 14).

**b) <u>The Pledge Agreement Was Not Amended By Subsequent Agreements Or Amendments And Therefore Such Documents Cannot Be Read Together.</u>**

As stated above, the Movants unsuccessfully argue that reading the Pledge Agreement, Webster Loan Amendment, and Subrogation Agreements together "demonstrates that RFI and RBC both acknowledged the rights of Prairie as a subrogated party *under all Agreements*." (Motion, ¶ 34) (emphasis added).  The Court has already determined that "the Subrogation Agreement does not change the [fact that Pledge Agreement was terminated] because Prairie was not an original party to the Pledge Agreement and did not seek an amendment to the Pledge Agreement in order to obtain the rights thereunder."  (Opinion, p. 27).  The Movants, in response, argue that the Pledge Agreement was already amended.  (Motion, ¶ 33).  The Movants' argument here is based on their assertions that the Court overlooked amendments and other documents affirming that Prairie was a subrogated party under all agreements.  (*Id.* at ¶ 34).

A document may be incorporated by reference into a contract if the original contract describes the document, but the original contract must clearly express "the parties' intent to be bound by [those] terms."  *See Int'l Star Registry of Ill. v. Omnipoint Mktg., LLC*, 2006 U.S. Dist. LEXIS 68420, at *9 (N.D. Ill. September 6, 2006) (subsequent clauses were incorporated into the original contracts because the original contracts included reference that parties were bound by the terms of the clauses).

The Court agrees with the Trustee that the Pledge Agreement, Subrogation Agreements and other loan documents are distinct agreements not meant to be read together.  (Opposition, pp. 14-15).  The Movants are therefore incorrect that the Pledge Agreement was amended by subsequent documents or the Subrogation Agreements.[37]  (Opposition, pp. 14-16); (*see also*

---

[37] The law "as to incorporation of a document by reference in a contract is the same in Illinois and Florida."  *Int'l Star Registry of Ill. v. Omnipoint Mktg., LLC*, 2006 LEXIS 68420, at * 9.

Opposition, pp. 14-15).  The Pledge Agreement was executed on December 24, 2014.  (RFI

Docket No. 113-8).  It was executed by RFI, RBC, and Webster for the purpose of pledging the

RBC Share to Webster, which would return to RFI upon Webster's loan being satisfied in full.

(*Id.*).  The Movants are not referenced in the Pledge Agreement.  The Subrogation Agreements,

executed after August 2019, and amendments do not reference the Pledge Agreement or any

change to the terms of the Pledge Agreement.  (RFI Doc Nos. 126-10, 126-11).  Also, as stated

by the Trustee, there was separate consideration given for each agreement.  (*See* Opposition, p.

14); *see also Carvel Corp. v. Diversified Mgmt. Grp., Inc.*, 930 F.2d 228, 233 (2d Cir. 1991)

("Under New York law, instruments executed at the same time, by the same parties, for the same

purpose and in the course of the same transaction will be read and interpreted together.").

Moreover, the purpose of the Subrogation Agreements was to reflect that Prairie, Founders

Equity I LP, Haber and Teeger deposited and pledged additional funds as collateral security for

the Webster Loan.  (RFI Docket No. 126-10).  While parties to these agreements are bound to

each agreement, that does not indicate that the parties are agreeing to a change in terms of any

document not explicitly referenced in subsequent contracts.[38]  When there are multiple

agreements, the documents must be part of the same transaction to be read together.  *See Sony

Corp. v. Fujifilm Holdings Corp.*, 2017 U.S. Dist. LEXIS 164127, at *20 (S.D.N.Y. September

28, 2017) ("[I]nstruments executed at the same time, by the same parties, for the same purpose,

and in the course of the same transaction will be read and interpreted together, it being said that

they are, in the eye of the law, one instrument.").

---

[38] The Court notes that RFI, RBC, and Webster intended to be bound by the Subrogation Agreements and Webster
Loan Amendment, but nothing in the record reflects that the parties intended to amend the Pledge Agreement to
subrogate Prairie in the Agreement.

43

As stated earlier, the Movants also argue that the Pledge Agreement can be read in conjunction with the Subrogation Agreements as they are an "integrated agreement" and therefore must be read together.  (Reply, ¶ 20).  However, for agreements to be integrated documents, they need to reference the parties and terms of the contract meant to be integrated among the documents and/or amendments.  *See VEP Biotech LTD v. Quadrant Biosciences, Inc.*, 2024 U.S. Dist. LEXIS 169641 (N.D.N.Y. September 19, 2024) (two distinct documents that are intended to be integrated should reference each other and mention terms that merge the two agreements into one agreement).  Here, the Pledge Agreement does not reference the Subrogation Agreement.  (RFI Docket No. 113-8).  The Subrogation Agreements and other amendments do not explicitly mention or reference the Pledge Agreement.  (RFI Docket No. 126-10).  As the Court determined above, the Pledge Agreement was executed for a different purpose and contemplates different parties than the Subrogation Agreement.  (RFI Docket Nos. 126-10 and 126-11).

The Movants further argue that the Webster Loan Amendment amended the Pledge Agreement by reference.  (Motion, ¶ 32).  However, the Webster Loan Amendment references "Loan Documents" generally and does not explicitly mention the terms of the Pledge Agreement with respect to termination.  (*See id.* at ¶ 35); (*see also* RFI Docket No. 126-14).  The Court agrees with the Trustee that "for contracts to be construed together, they must be based upon the same consideration."  (*See* Opposition, p. 14); *see also In re 717 Grand Street Corp.*, 259 B.R. 1, 5 (Bankr. E.D.N.Y. 2000).  The purpose of the Webster Loan Amendment is to amend only Section 16.3(f) of the Webster Loan and to make Prairie the grantee of the right of first refusal.  (RFI Docket No. 126-14).  The Webster Loan Amendment did not amend the terms of the Pledge Agreement's termination clause.  The Movants also argue that the Pledge Agreement is

44

contemplated when the Amendment discusses "Loan Documents." (Reply, ¶ 20). However, even if this claim were true, this reference is not sufficient to amend the Pledge Agreement's termination clause. Moreover, to the extent the Pledge Agreement is referenced in the Webster Loan Amendment, the Court has already established the Pledge Agreement, and all rights thereunder, terminated. (Memorandum Opinion and Order, p. 27).

Therefore, based on the foregoing, the Court finds that the Movants have not offered any information to justify reconsideration of this Court's original decision that the Pledge Agreement had been terminated and subsequent amendments or Subrogation Agreements do not alter the impact of the Agreement. (Memorandum Opinion and Order, p. 27). Accordingly, the Trustee could vote the RBC Share.

### c) Equitable Subrogation Does Not Prevent the Pledge Agreement From Terminating By Its Terms.

The Movants assert that the Court should reconsider the portion of its Opinion relying on the absence of an amendment to the Pledge Agreement referencing Prairie or the other parties. (Motion, ¶ 38). The Movants argue that "no other document need be amended to name the surrogate parties who step into the shoes of the Lender." (*Id.* ¶ 39). The Movants argue that "there was no need to amend the Pledge Agreement because Prairie steps into the shoes of [Webster]." (*Id.*). They state that, "RFI and Webster each executed the Subrogation Agreement and, as such, it amends the Pledge Agreement in any event . . . ." (*Id.* at ¶ 40). The Trustee opposes the Movants' argument that the remedy of equitable subrogation applies. (Opposition, p. 17). The Trustee asserts that for equitable subrogation to apply, the following requirements must be satisfied:

> 1) the claimant must have made payment to protect his own interests; 2) the claimant must not have been a volunteer; 3) the payment must satisfy a debt for which the claimant was not primarily liable; 4) the entire debt must have been paid; and 5) subrogation must not cause injustice to rights of others.

45

*Carol Ruth, Inc. v. Provident Life and Acc. Ins. Co.*, 1995 WL 130530, at *6 (S.D.N.Y. 1995) (internal citations omitted).

The Trustee argues that Prairie does not meet the standard for equitable subrogation because: 1) Prairie did not make a pledge to Webster to "protect its own interest"; 2) any pledge Prairie made would be voluntary; 3) Prairie was "neither primarily nor secondarily liable for the Webster obligation"; 4) by the Movants' own admission, the Webster loan was not paid in full; and 5) subrogating Prairie to Webster causes injustice to other parties. (*Id.* at ¶ 17-18).

The Court agrees with the Trustee, although for slightly different reasons, that Prairie does not satisfy the elements of equitable subrogation related to the Webster Loan.[39]

Subrogation refers to substituting one party for another. *JPMorgan Chase Bank v. Cook*, 318 F. Supp. 2d 159, 165 (S.D.N.Y. 2004) ("Subrogation simply means substitution of one person for another; that is, one person is allowed to stand in the shoes of another and assert that person's rights against the defendant.") (internal quotation marks and citation omitted). Equitable subrogation is commonly applied in this district "where one party's property is used in discharging an obligation owed by another or a lien upon the property of another, under such circumstances that the other would be unjustly enriched by the retention of the benefit thus conferred." *See United States v. Meiri*, 2024 U.S. Dist. LEXIS 189764, at *53 (S.D.N.Y. October 17, 2024) (finding that the parties are not entitled to equitable subrogation because the original loan was paid off on its own terms from funds not extended by the alleged subrogee).

---

[39] The Court reiterates that the Movants could have raised this argument in their original Motion to Dismiss but failed to do so. (RFI Docket No. 113). This argument, like the arguments addressed earlier, fails to meet the standard for reconsideration under Bankruptcy Rules 9023 and 9024. The Movants do not establish how Prairie as an equitable subrogee warrants reconsideration of this Court's decision denying dismissal.

RFI and RBC did not use funds from the Prairie Loan to satisfy the obligation to Webster. *See Commer. Lender, LLC v. DeVivo*, 2023 U.S. Dist. LEXIS 224946 (E.D.N.Y. December 18, 2023) (plaintiff failed to establish that its property was used to discharge an obligation owed by the borrower and therefore the borrower was not unjustly enriched). The Prairie Subrogation Agreements were used to provide additional security and collateral for the Webster Loan. (RFI Docket No. 126-10). The Webster Loan was paid from the Roses UCC Sale. (RFI Docket No. 113-13). Further, the Prairie Loan was not extinguished, and Prairie was in fact paid from the sale.[40]

Some courts in other districts commonly have applied the five-part standard for equitable subrogation stated by the Trustee in its Opposition. *See In re East Texas Steel Facilities, Inc.,* 117 B.R. 235, 241 (Bankr. N.D. Tex. 1990).

If this Court applies this five-part test, the Movants still would not be entitled to equitable subrogation. As to the third element of the test, Prairie's pledged collateral in the Subrogation Agreements did not satisfy the Webster Loan. (RFI Docket No. 126-10). The Court agrees with the Trustee that the Prairie "was neither primarily nor secondarily liable for the Webster [Loan]." (Opposition, p. 18). The Webster Loan was satisfied by the Roses UCC Sale. (RFI Docket No. 113-13). The purpose of the Subrogation Agreements was to reflect that Prairie and other parties pledged additional funds to be held by Webster as additional collateral security for the Webster Loan. (RFI Docket No. 12-10 at 2-3); (*see also* Opposition, p. 18). Ultimately, the Webster Loan and Prairie's loan were settled by the Roses UCC Sale. (RFI Docket No. 113-12). Therefore, the third element of the five-part test for equitable subrogation is not met, and

---

[40] Prairie, Doge and Talcott were the only parties who did not settle with Trustee in the Adversary Proceeding. *See* Adversary Proceeding.

equitable subrogation is not available to Prairie.[41]  *See Carol Ruth, Inc. v. Provident Life*, 1995

U.S. Dist. LEXIS 3734, at *21 (S.D.N.Y. March 24, 1995) (equitable subrogation was not

available to the party that did not pay the debt of another party).

As such, the Pledge Agreement terminated on its own terms when the Webster Loan was

paid, and therefore the Trustee could vote her share.

### D.  BEST INTERESTS OF CREDITORS

The Movants do not proffer any new arguments or information that justify

reconsideration of whether dismissal is in the best interests of creditors.  (Motion, p. 13).

The Trustee asserts that "the Movants have failed to demonstrate matters of controlling

decisions which the Court has overlooked in determining dismissal would not be in the best

interest of creditors."  (Opposition, p. 18).  The Trustee then references this Court's prior

decision noting that dismissal of the RBC case "could potentially deprive the Trustee of pursuing

the Adversary Proceeding . . . ."  (*Id.*, at p. 19).

The Movants have not asked this Court to reconsider its decision that dismissal of the RBC Case

is not in the best interests of creditors and parties. Even if they had, this Court reaffirms its

determination denying the Motion to Dismiss because "dismissal is not in the best interest of all

parties in interest . . . [as this] could potentially deprive the Trustee of standing to pursue the

Adversary Proceeding from which the RBC estate may significantly benefit."  (Memorandum

Opinion and Order, p. 29).

---

[41] For a party to be entitled to equitable subrogation under the five-part test, *all* elements of the test must be satisfied.
*See In re Carol Ruth, Inc.*, 1995 WL 130530, at *6.  Since at least one element is not met, the Court need not
address the remaining factors.

V.    **<u>CONCLUSION</u>**

For the foregoing reasons, the Movants have not established that the Court should

reconsider the Memorandum Opinion and Order Denying the Motion to Dismiss.  Movants'

Motion to Reconsider (Docket No. 140-1) is DENIED. Any arguments not addressed above are

deemed OVERRULED.

**IT IS SO ORDERED.**

Dated: New York, New York
       <u>February 6, 2025</u>                     <u>/S/ John P. Mastando III</u>
                                                  HONORABLE JOHN P. MASTANDO III
                                                  UNITED STATES BANKRUPTCY JUDGE